ANDREA A. TREECE, State Bar No. 237639
Earthjustice
50 California Street, Suite 500
San Francisco, CA  94111
Telephone:  415-217-2000
Facsimile:  415-217-2040
Email:  atreece@earthjustice.org

STEPHEN D. MASHUDA (*Pro Hac Vice forthcoming*)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA 98104
Telephone: 206-343-7340
Facsimile: 206-343-1526
Email: smashuda@earthjustice.org

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OCEANA, Inc., | ) |
| | ) |
| Plaintiff, | ) Case No. |
| | ) |
| v. | ) |
| | ) **COMPLAINT FOR DECLARATORY** |
| WILBUR ROSS, in his official capacity as | ) **AND INJUNCTIVE RELIEF** |
| Secretary of Commerce; NATIONAL OCEANIC | ) |
| AND ATMOSPHERIC ADMINISTRATION; and | ) |
| NATIONAL MARINE FISHERIES SERVICE, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**INTRODUCTION**

1.    Above all else, the Magnuson-Stevens Fishery Conservation and Management Act requires the National Marine Fisheries Service to manage federal fisheries based on the best scientific information available to prevent overfishing and protect the marine ecosystem.  This suit challenges the Fisheries Service's continued failure to comply with these bedrock requirements in its May 31, 2019 Catch Rule and the Coastal Pelagic Species Fishery Management Plan provisions that rule implements.  The agency's insistence on setting unchanging catch limits that do not reflect the status of the anchovy population and are not subject to any regular review or adjustment fails to account for the well-known "boom and bust" cycle of the central subpopulation of northern anchovy (hereinafter, "anchovy") and its vital importance to the West Coast marine ecosystem.

2.    In 2018, this Court held that the Fisheries Service, *et al.*,[1] must apply the best available science and issue a new rule that prevents overfishing of anchovy.  *Oceana v. Ross*, 5:16-cv-06784, 2018 WL 1989575 (N.D. Cal. Jan. 18, 2018).  The Court determined that the agency's 2016 annual catch limit, acceptable biological catch, and overfishing limit (collectively, "catch limits") were unlawfully based on decades-old data about the size of the anchovy population, did not bear any relationship to the actual size of that population, and thus could not prevent overfishing of this population.  The decision explicitly recognized that in order to prevent overfishing, catch limits must be based on the size of the anchovy population.  Anchovy populations naturally experience rapid changes in abundance, meaning management must be responsive to the fluctuating population and cannot rely on unchanging catch limits to prevent overfishing.  In the new rule challenged in this Complaint,[2] the Fisheries Service doubles down on its previous unlawful approach and attempts to lock in catch limits for an indefinite period that fail to account for the fact that the anchovy population undergoes frequent and rapid declines.

---

[1] Federal Defendants include Wilbur Ross in his official capacity as Secretary of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service. They will be referred to collectively in this Complaint as "the Fisheries Service," "the Service," or "the agency."

[2] *Fisheries off West Coast States; Coastal Pelagic Species Fisheries; Multi-Year Harvest Specifications for the Central Subpopulation of Northern Anchovy*, 84 Fed. Reg. 25196-25202 (May 31, 2019) ("2019 Catch Rule")

3.     Specifically, the 2019 Catch Rule establishes values for three interrelated limits: the overfishing limit, the acceptable biological catch, and the annual catch limit.  Together, these three provisions are supposed to prevent overfishing and ensure that enough anchovy are left in the water to feed other fish and wildlife.

4.     Despite the well-documented decline of anchovy during the past decade, and the biological fact that the anchovy population fluctuates widely and sometimes rapidly, the 2019 Catch Rule allows commercial fishing vessels to catch 23,573 metric tons of anchovy every year, regardless of the size of the anchovy population.  In other words, the new rule would allow 23,573 metric tons of catch regardless of whether the population rapidly declines to very small levels, was at its historic average size, or was in a boom period.  This unchanging catch limit ignores the agency's legal duties to apply the best available science to anchovy management, and its non-discretionary duty to adjust the catch limits based on best available science to prevent overfishing in the down years.

5.     The Magnuson-Stevens Act requires that the annual catch limit also account for the needs of the myriad other marine predators that depend on anchovy.  The best available science demonstrates the intertwined fates of these predators and their prey: when anchovy populations decline, predators like brown pelicans and California sea lions suffer starvation, breeding failures, and death.

6.     The Fisheries Service claims its approach to setting catch limits without looking at how the anchovy population changes each year is consistent with the Coastal Pelagic Species Fishery Management Plan's approach to managing anchovy and other so-called "monitored" fish populations.  But the agency's application of that approach here serves only to highlight that the Plan itself violates the Magnuson-Stevens Act.

7.     The Plan's "monitored stock" provisions purport to allow the agency to set all three catch limits once, when the rule is issued, without requiring the agency to periodically check them against new data as the stock fluctuates over time.  While the Plan indicates that the agency has discretion to revise the catch limits in light of new data in a new rule – and the agency itself routinely collects data on anchovy abundance – the Plan does not require the agency to do so.

Accordingly, the Plan, like the 2019 Cath Rule that applies it, is inconsistent with the mandatory Magnuson-Stevens Act duties to use the abundance information the Service collects every year to update its understanding of the population status and review the catch limits to ensure that they reflect the size of the population, prevent overfishing of that population, and account for the needs of marine predators. Oceana challenges the Fisheries Service's 2019 Catch Rule, and the provisions of the Plan it applies, because they fail to use the best available science, will not prevent overfishing, and fail to protect this vital population of anchovy at the base of the West Coast marine ecosystem's food web on an ongoing basis.

8.    The 2019 Catch Rule and the Plan provisions it purports to implement fail to comply with multiple legal requirements. First, the Fisheries Service violated the Magnuson-Stevens Act and the Administrative Procedure Act ("APA") by setting unchanging, long-term catch limits—the annual catch limit, as well as the related acceptable biological catch and overfishing limit—without regard for the dramatic annual fluctuations in the size of the anchovy population and without explaining how they would prevent overfishing when the anchovy population declines to low levels. Second, the Fisheries Service violated the Magnuson-Stevens Act and the APA by failing to demonstrate how its unchanging annual catch limit accounts for the needs of marine predators when the anchovy population declines. Third, the Fisheries Service violated the Magnuson-Stevens Act and the APA by applying the Plan's "monitored stock" approach to set unchanging long-term limits unresponsive to the annually fluctuating anchovy population.

9.    In the alternative, assuming that it did not violate the Magnuson-Stevens Act by setting unchanging catch limits without regard to the fluctuating population size, the 2019 Catch Rule is still arbitrary and capricious. The agency irrationally cherry-picked three recent years of data showing high abundance and used that to set unchanging catch limits that will remain in place indefinitely without any rational explanation for why it disregarded other available and reliable information from low abundance years.

10.    By committing each of these actions and omissions, the Fisheries Service failed to comply with the statutory requirements of the Magnuson-Stevens Act and acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation

of the APA.  The Fisheries Service's actions and failures to act have harmed Oceana's members' interest in rebuilding and maintaining a healthy and sustainable population of anchovy and a healthy ocean ecosystem.  This harm will continue in the absence of action by the Court.

**JURISDICTION AND VENUE**

11.    This action arises under the Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1884, and the APA, 5 U.S.C. §§ 701-706.

12.    This Court has jurisdiction over this action pursuant to the Magnuson-Stevens Act, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act. 16 U.S.C. § 1861(d).  The Magnuson-Stevens Act also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable."  16 U.S.C. § 1855(f).  The Fisheries Service published the 2019 Catch Rule on May 31, 2019 in the Federal Register.  Oceana is filing this Complaint within 30 days of publication of the 2019 Catch Rule.

13.    This Court, further, has jurisdiction over this action pursuant to the APA, which provides that final agency action is subject to judicial review.  5 U.S.C. §§ 701-706.  The Fisheries Service's issuance of the 2019 Catch Rule is a "final agency action" subject to judicial review under the APA.

14.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

15.    This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and may also grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1861(d) and 1855(f), as well as the APA, 5 U.S.C. § 706.

16.    Venue is properly vested in this judicial district under 28 U.S.C. § 1391(e), because a

substantial part of the events and omissions which gave rise to this action occurred in this district.

## INTRADISTRICT ASSIGNMENT

17.     This action should be assigned to the San Jose Division pursuant to Civil L.R. 3-2(e) because a substantial part of the events or omissions giving rise to the claim occurred in Santa Cruz County and Monterey County.

18.     This case challenges a final rule promulgated in direct response to a previous ruling from U.S. District Court Judge Lucy H. Koh of the San Jose Division in, *Oceana v. Ross,* 5:16-cv-06784-LHK, concerns the same parties and the same subject matter at issue in that ongoing matter, and is related to that case pursuant to Civil L.R. 3-12(a).

## PARTIES

19.     Plaintiff OCEANA is a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education.  Oceana has over 850,000 members worldwide, including 117,109 members in California, Oregon, and Washington.  Oceana maintains an office in Monterey, California.  Ensuring the conservation and sound management of anchovy and other forage species, such as the species managed under the Catch Rule, is a central focus of Oceana's work.  Oceana devotes considerable resources to studying and communicating the ecological and economic importance of sound management of forage species in the California Current Ecosystem off the U.S. West Coast.

20.     Oceana and others have urged the Pacific Fishery Management Council ("Council") and the Fisheries Service to fulfill their legal obligations to sustainably manage northern anchovy. For nearly a decade, Oceana and others have specifically requested that the Fisheries Service and the Council consider updated abundance estimates for northern anchovy; establish a scientifically based and annual catch limit, acceptable biological catch, and overfishing limit; conduct a full stock assessment of northern anchovy; and develop an ecosystem-based management framework for managing the stock.  These requests were made in letters to the Council in June 2010, June and October 2013, March and September 2014, June and October 2015, and September 2016.  In February 2015, Oceana submitted comments to the Fisheries Service on Amendment 14 to the Coastal Pelagic Species fishery management plan, requesting that the Fisheries Service conduct an

updated stock assessment and develop an annual catch limit that reflects anchovy's importance to marine predators in the California Current Ecosystem.  Oceana commented on the Fisheries Service's proposed 2016 Catch Rule in December 2015, describing the scientific evidence indicating a collapse of the stock.  Oceana subsequently challenged the 2016 Catch Rule, which this Court set aside for violations of the Magnuson-Stevens Act and APA.  Oceana continued to advocate for scientifically valid management of anchovy after the Court's ruling.  On April 7, 2018 and April 12, 2019, the Pacific Fisheries Management Council considered anchovy management.  Oceana staff attended both meetings and provided public comment, highlighting the importance of a new overfishing limit, acceptable biological catch, and annual catch limit.  Most recently, Oceana commented on the proposed 2019 Catch Rule, describing the rule's failure to use the best available science and prevent overfishing as well as the numerous scientific and legal problems with the agency's "monitored stock" management approach.

21.     Oceana's members use and enjoy the oceans for numerous activities, including fishing, wildlife observation, scuba diving, snorkeling, boating, swimming, beach walking, research, and study.  Oceana's members value and depend upon a healthy marine environment for these activities.  Oceana's members also consume seafood caught in the California Current Ecosystem. They are concerned about and directly affected by environmental injury caused by unsustainable fishing in the U.S. West Coast fisheries resulting in depletion of northern anchovy and the larger predatory fish and wildlife that rely on northern anchovy to grow and thrive.  Injuries to Oceana's members include injuries to their consumption and recreational and commercial use of fish populations, as well their interest in healthy populations of sea lions, brown pelicans, humpback whales, and other wildlife.

22.     The above-described aesthetic, conservation, recreational, commercial, scientific, educational, and other interests of Oceana and its members have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely affected and irreparably injured by the Fisheries Service's failure to protect northern anchovy through the unlawful 2019 Catch Rule.  These injuries are actual and concrete and would be redressed by the relief Oceana seeks here.  Oceana has no adequate remedy at law.

23.    The Defendants in this action are:

a.    WILBUR ROSS.  Mr. Ross is sued in his official capacity as Secretary of Commerce.  He is ultimately responsible for overseeing the proper administration and implementation of the Magnuson-Stevens Act in connection with federal fisheries management actions, including provisions related to the duty to end and prevent overfishing and achieve optimum yield and base all conservation and management measures on the best available science.

b.    NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION.  The National Oceanic and Atmospheric Administration is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of the Department of Commerce has delegated responsibility to ensure compliance with the Magnuson-Stevens Act to the National Oceanic and Atmospheric Administration, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

c.    NATIONAL MARINE FISHERIES SERVICE.  The National Marine Fisheries Service is an agency of the United States Department of Commerce that has been delegated the primary responsibility to ensure that the requirements of the Magnuson-Stevens Act and other applicable laws are followed and enforced, including the requirements to prevent and end overfishing, account for the needs of the ecosystem in order to achieve optimum yield, and set rational annual catch limits and other reference points based on best available science.  In that capacity, the Fisheries Service must review fishery management plans and amendments to those plans, and issue implementing regulations.

## LEGAL BACKGROUND

### Magnuson-Stevens Act Framework for Preventing Overfishing

24.    The Magnuson-Stevens Act governs the conservation and management of fisheries in the United States territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (typically 3 miles from shore) to 200 miles offshore or to an international boundary with neighboring countries.  16 U.S.C. §§ 1801(b)(1); 1802(11).  The Magnuson-Stevens Act creates eight regional Fishery Management Councils and requires them to prepare fishery management plans for all fisheries under their authority that require conservation and management.

16 U.S.C. § 1852(h)(1).

25.    All fishery management plans and amendments developed by the Councils and regulations implementing fishery management plans and amendments are subject to final review and approval by the Fisheries Service to ensure that they comply with the requirements of the Magnuson-Stevens Act, as well as with other applicable laws and requirements.  16 U.S.C. § 1854(a), (b).

26.    The Magnuson-Stevens Act requires that fishery management plans, fishery management plan amendments, and any regulations promulgated to implement such fishery management plans, must be consistent with the "National Standards" for fishery conservation and management, and certain other requirements.  16 U.S.C. § 1851(a).

27.    The Magnuson-Stevens Act establishes a common-sense approach to prevent overfishing, requiring that the Fisheries Service assess the condition of each fish population it manages using the best scientific information available and base management measures such as catch limits on the current size of the population.  In other words, the Act requires the Fisheries Service to determine as best it can how many fish are in the water and ensure that its catch limits leave enough fish in the water to prevent overfishing and protect the marine ecosystem.

28.    National Standard One of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." 16 U.S.C. § 1851(a)(1).

29.     National Standard Two of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  "Conservation and management measures" include "all of the rules, regulations, conditions, methods, and other measures" to "rebuild, restore, or maintain … the marine environment," including annual catch limits, acceptable biological catch, and objective and measurable criteria for determining when a stock is overfished, such as the overfishing limit.  *Id.* §§ 1802(5); 1853(a)(1), 1853(a)(10), 1853(a)(15); 50 C.F.R. § 600.310(e)(2)(A), (D).

30.    Because the first step to preventing overfishing and achieving optimum yield is to understand the status of the fish population, the Magnuson-Stevens Act requires each fishery

management plan to "assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery, and include a summary of the information utilized in making such specification." 16 U.S.C. § 1853(a)(3). The status of the population must inform the catch limits described below.

31.    In 2006, Congress enacted the Magnuson-Stevens Reauthorization Act, which among other things established a system of interrelated management measures and reference points intended to prevent and end overfishing. Pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1851(b), the Fisheries Service has promulgated guidelines that reflect the agency's interpretation of the Act's requirements to prevent overfishing and rely on the best available science. 50 C.F.R. § 600.305(a)(3). These guidelines provide further details on how required measures are established and work as part of a system to prevent and end overfishing. Of particular relevance here, this system includes establishing and revising the key measures: overfishing limits, acceptable biological catches, and annual catch limits.

32.    To avoid overfishing, the Fisheries Service must first establish an "overfishing limit" that estimates the catch level (expressed in numbers or weight of fish) above which overfishing will occur. 50 C.F.R. § 600.310(e)(2)(i)(D).

33.    The Fisheries Service must then specify the "acceptable biological catch" for each stock, which provides an upper limit on annual catch that accounts for scientific uncertainty in estimating the overfishing limit, as well as any other scientific uncertainty. 50 C.F.R. § 600.310(f)(1)(ii). Fishery managers "must articulate how [acceptable biological catch] will be set compared to the [overfishing limit] based on the scientific knowledge about the stock . . . and taking into account scientific uncertainty" and "should consider reducing fishing mortality as stock size declines…and scientific uncertainty increases." *Id.* § 600.310(f)(2)(ii).

34.    The function of acceptable biological catch is to ensure that any error in estimating the overfishing limit does not result in overfishing.

35.    Each fishery management plan must "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to

ensure accountability."  16 U.S.C. § 1853(a)(15).

**Fishery Management Measures Must Protect the Marine Ecosystem**

36.    The Magnuson-Stevens Act and its implementing regulations emphasize the importance of protecting marine ecosystems and making decisions about fisheries in the context of the health and long-term sustainability of the marine environment.  The Act requires that fisheries be managed to achieve "optimum yield," 16 U.S.C. § 1801(b)(4), which is defined as the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems," and "is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or *ecological* factor."  16 U.S.C. § 1802(33)(A)-(B) (emphasis added).

37.    To determine optimum yield in the context of protecting marine ecosystems, the Fisheries Service must consider, among other things, "maintaining adequate forage for all components of the ecosystem."  50 C.F.R. § 600.310(e)(3)(iii)(A)(*3*).  Ecological factors that the Fisheries Service is supposed to consider when determining the appropriate level for optimum yield include the fishery's "impacts on ... forage fish stocks, other fisheries, predator-prey or competitive interaction, marine mammals, threatened or endangered species, and birds . . . ."  *Id.* § 600.310(e)(3)(iii)(B)(*3*).  In addition, the regulatory guidelines advise fishery managers to consider managing forage stocks to leave a larger proportion of the population to feed marine predators rather than the smaller proportion they would leave unfished if they managed only to attain maximum sustainable yield.  *Id.*

38.    The Fisheries Service's interpretation of Magnuson-Stevens Act requirements states that the annual catch limit should be reduced below the acceptable biological catch level to account for ecological, economic, and social factors.  It also specifically states that annual catch limit should be reduced to address the "needs of forage fish" such as anchovy.  50 C.F.R. § 600.310(f)(4)(iv).

39.    The Secretary has the responsibility to carry out any fishery management plan or plan amendment approved or prepared by him in accordance with the Magnuson-Stevens Act.  16 U.S.C. § 1855(d).

**FACTUAL BACKGROUND**

**Role of Anchovy in California Current Ecosystem**

40.    Anchovy are a keystone forage species in the California Current Ecosystem off the U.S. West Coast.  They are preyed upon by a wide variety of marine wildlife, including commercially and recreationally valuable fish, mammals, and sea birds.  Studies of predator diets show that anchovy are among the most important forage fish throughout the California Current Ecosystem in terms of the number of predators they support and the importance in predators' respective diets.

41.    Anchovy are preferred prey due to their high fat content, small body size, tendency to school (which makes them easier to catch), and superior nutritional value.  Some marine predators are highly dependent on anchovy abundance for their survival and reproductive success, and suffer food-related reproductive failures when anchovy are not readily available, even if other prey are available.  For example, northern anchovy availability within foraging distance of brown pelican breeding colonies is among the most important factors influencing pelican breeding success.  While the brown pelican was listed under the Endangered Species Act, the anchovy fishery was required to account for brown pelican forage needs in setting catch limits.  When the U.S. Fish and Wildlife Service delisted the brown pelican in 2009, it did so partly on the assumption the Coastal Pelagic Species Fishery Management Plan would provide adequate forage for the bird.  Since that time, however, brown pelicans experienced unprecedented die-offs and multi-year breeding failures from 2008 to 2015 due to lack of high quality forage – particularly, anchovy and Pacific sardine (also managed under the Plan).

42.    In addition to supporting many species of sea birds and predatory fish, anchovy also support many species of marine mammals, including seals, sea lions, dolphins, porpoises, and whales.  A study led by the Fisheries Service found that availability of northern anchovy and Pacific sardine is especially important for breeding California sea lions, and that the lack of adequate supplies of anchovy and sardine in recent years was the primary factor in mass starvation and die-offs among California sea lion pups in 2013, 2014, 2015, and 2016.  This was the case even though other prey items, such as rockfish and squid, were locally available because these alternative prey

species lack the energy content sea lion mothers need to successfully feed and wean their pups.

43.    A number of threatened and endangered species rely on northern anchovy as a preferred prey.  These species include populations of threatened and endangered Chinook salmon; sea birds such as the endangered California least tern and threatened marbled murrelet; and marine mammals such as threatened and endangered populations of humpback whales.

44.    Because anchovy provide an essential food source for whale, sea lion, sea bird, and other wildlife populations, anchovy are critical to supporting the tourism associated with seeking and watching these animals.  In Monterey Bay alone, whale watch business owners have estimated that a single ton of anchovy left in the water to feed a humpback whale can bring in $1,000 to $3,000 in direct whale watching ticket revenue.

45.    Healthy anchovy populations are also crucial to the productivity and sustainability of other commercially and recreationally important fish species, including swordfish, salmon, bluefin tuna, and groundfish species like rockfish, lingcod, and halibut.

**The Rapidly Fluctuating, "Boom and Bust" Pattern of the Anchovy Population**

46.    Anchovy populations naturally experience rapid changes in abundance, particularly in response to changes in ocean conditions.  Analyses of anchovy abundances over the last 30 years show a pattern of periodic, brief spikes to high levels followed by dramatic drops in abundance, after which the population remains at significantly lower levels for prolonged periods.  These data show that the anchovy population can decline by more than 90 percent over a two-year period and did so most recently between 2005 and 2007.



**Figure 1: Central Subpopulation of Northern Anchovy biomass in the U.S. and Mexico from 1951 to 2015. From Thayer et al. 2017.[3]**

47.    Even more so than other species, schooling forage fish like anchovy are highly vulnerable to overfishing and collapse.  Recent studies of forage species around the world, including northern anchovy, found that fishing forage species during a decline can increase the rate and magnitude of population collapses, and delay population recovery after a collapse.

48.    Population fluctuations can also be magnified by long-term changes in ocean conditions caused by climate change and ocean acidification.  Even relatively moderate changes in fishing levels can result in significant changes in forage species abundance and their local availability to predators, particularly during times when the species' productivity is already low due to environmental conditions.

49.    Multiple scientific studies have concluded that setting a constant, unchanging catch limit for a species with a naturally fluctuating population results in more severe population collapses and harms the population's ability to recover.

---

[3] Thayer et al. 2017. California anchovy population remains low, 2012-2016. CalCOFI Rep., Vol. 58, 2017. Figure 3.

50.    Because forage species are so ecologically important, scientific studies recommend that fishery managers set catch limits that leave a large proportion of a forage species' mean unfished biomass (the level of biomass that would exist without any fishing) in the ecosystem to provide for the needs of predators, minimize risk of stock collapse, and maintain ecosystem health. Many studies recommend not allowing fishing on forage fish stocks when their population drops below one half of their mean unfished levels to protect their role in the ecosystem.

**Need for a Robust Anchovy Population in the Context of Declines in Multiple Forage Fish Species**

51.    The central subpopulation of northern anchovy is managed in concert with other forage species. The Coastal Pelagic Species Fishery Management Plan governs management of this anchovy population as well as several other forage species, including Pacific sardine and Pacific mackerel.

52.    In 2012, Fisheries Service scientists published a peer-reviewed study warning that the agency was allowing too much fishing on an already declining Pacific sardine stock.  Despite warnings from its own scientists and others, the Fisheries Service continued to authorize the maximum catch limits permissible under the Plan's framework for Pacific sardine.

53.    In April 2015, the Fisheries Service realized that it had made errors in its prior stock assessments that had led to overestimates of the sardine population.  The corrected assessment revealed that the Pacific sardine stock was well below the minimum level to sustain the fishery.  As a result, the Fisheries Service closed the Pacific sardine fishery for the remainder of the 2015 season (April-June 30) and the July 1, 2015-June 30, 2016 fishing year.  The Pacific sardine population has failed to recover since that time.  The Fisheries Service's most recent stock assessment in April 2019 revealed that the stock had declined to less than 28,000 metric tons and is overfished.

54.    Other key forage species, including Pacific mackerel, which are managed under the Plan, and Pacific herring, have also declined to low numbers in recent years.  While many predators are adapted to switch prey sources in response to changes in relative availability, this simultaneous decline in multiple preferred forage species leaves marine predators with fewer high-energy prey alternatives and can force them to switch to relatively low nutrition food sources.  The longer-term decline of other prey sources makes it all the more vital that management measures promote a robust

anchovy population and protect the remaining forage base for predators.

**Management of Anchovy under the Coastal Pelagic Species Fishery Management Plan**

55.     Fishing for anchovy is managed under the Coastal Pelagic Species Fishery Management Plan.  Commercial fishing vessels targeting northern anchovy operate off the California coast using large nets such as purse seines that surround schools of fish near the surface.

56.     The market value of northern anchovy is relatively low.  In 2018, fishermen reported selling their anchovy catch for only $100 per ton (5 cents per pound).  Anchovy are generally exported and used for agricultural or aquaculture feed or as bait.

57.     Prior to 2000, the northern anchovy fishery operated under a much more intensive management plan.  Under the Northern Anchovy FMP, fishery managers conducted annual assessments of the spawning and total biomass of anchovy and adjusted optimum yield specifications and catch levels accordingly.  Fishery managers noted that the "inherent variability of anchovy populations suggests that any fixed annual harvest would be too large in some years and too low in others.  Thus an optimum yield formula, which relates allowable annual harvest to the current population size, is superior to a fixed [optimum yield]."  Northern Anchovy FMP, Amendment 5 at 5 (1983).

58.     In 2000, the Fisheries Service changed the name of the fishery management plan to "Coastal Pelagic Species Fishery Management Plan" and removed the system of frequent adjustments to catch levels and safeguards for maintaining high levels of anchovy biomass in the water that had existed under the prior management regime.

59.     In 2006, Congress amended the Magnuson-Stevens Act to require annual catch limits for all federally managed fish stocks, as well associated measures for preventing overfishing, including the overfishing limit and acceptable biological catch.

60.     The Coastal Pelagic Species Fishery Management Plan as amended through Amendment 16 (i.e. the current version of the Plan in effect at the time of rulemaking) contains formulas for calculating annual catch limits for the anchovy stock, as well as acceptable biological catch levels, based on the estimated overfishing limit for the stock.  Under these formulas, the acceptable biological catch is set to 25 percent of the overfishing limit; this buffer between the

overfishing limit and acceptable biological catch is supposed to account for scientific uncertainty in the actual level of anchovy biomass, which fluctuates widely within short periods of time. The annual catch limit is set equal to acceptable biological catch "or reduced by [optimum yield] considerations." Coastal Pelagic Species FMP at 40.

61. The Plan currently categorizes anchovy as a "monitored" stock.[4] "Monitored" is not a category or management approach recognized by the Magnuson-Stevens Act or its implementing regulations. The Plan's "monitored stock" management approach lacks a number of features that are standard in other fishery management plans and required by the Magnuson-Stevens Act. Of most relevance here, it does not require the Fisheries Service to use the anchovy abundance data it collects every year to assess the current size or condition of the population or require the agency or Council to revisit and update catch limits on any regular basis based on the current size of the population, even if available data show the population has declined significantly.

62. The Plan states that "'monitored' management involves tracking trends in landings and qualitative comparison to available abundance data, but without periodic stock assessments, or periodic adjustments to target harvest levels." Coastal Pelagic Species FMP at 9. The Plan therefore monitors the amount of anchovy caught (or landed) to determine whether landings remain under the annual catch limit itself, and though it provides for a qualitative comparison between landings and abundance data, it does not provide a mechanism to ensure that the catch limits that are supposed to prevent overfishing are updated or adjusted based on the current size of the population.

63. The Plan also does not require regular assessments of the condition of the stock, either through stock assessments or annual abundance estimates derived from ongoing surveys. A stock assessment is a scientific analysis of the status of a fish stock, including its overall biomass. The Fisheries Service has not conducted a stock assessment for northern anchovy since 1995.

64. However, the agency does collect anchovy abundance data every year through its annual acoustic trawl survey and the CalCOFI survey. The Fisheries Service's Southwest Fisheries Science Center stated in a recent report that its experts "strongly feel that the most efficient scientific

---

[4] At its June 2019 meeting, the Pacific Fishery Management Council voted to remove the term "monitored" from the Coastal Pelagic Species Fishery Management Plan, but explicitly stated that the management approach currently called "monitored" would remain unchanged.

assessment for regularly advising management regarding the status (abundance) of any member of the [Coastal Pelagic Species] assemblage is the [acoustic trawl] survey-based approach." These experts also noted that a 2018 report "concluded that [acoustic trawl] data represented the best scientific information available on an annual basis for assessing abundance of all members of the [Coastal Pelagic Species] assemblage (except Pacific herring)." Crone, P.R., *et al*, May 2019, *Pacific mackerel (*Scomber japonicus*) stock assessment for U.S. management in the 2019-20 and 2020-21 fishing years*, Pacific Fishery Management Council, at 2. The Fisheries Service has produced annual anchovy abundance estimates based on this data since at least 2015.

65.    The Plan states that annual catch limits for "monitored" stocks are "specified for multiple years until such time as the species becomes actively managed or new scientific information becomes available." Coastal Pelagic Species FMP at 40. The Plan does not specify any time frame or schedule for revisiting catch limits relative to available abundance information; nor does it require the Council or Fisheries Service to revise catch limits when available scientific information shows that a species' abundance has dropped significantly.

### Previous Anchovy Population Decline and Court Rejection of 2016 Catch Rule

66.    The anchovy population collapsed between 2009 and 2015. At the time, numerous sources of scientific information showed that anchovy abundance had declined steeply since 2009 to historically low levels. These included peer-reviewed, published studies on anchovy abundance, abundance estimates derived by the Fisheries Service itself, survey data on anchovy eggs, larvae, and adults, and evidence of extreme food shortages among marine predators known to rely and anchovy and sardine.

67.    The effects of the decline in anchovy abundance shown in scientific analyses and surveys were particularly apparent in marine predators. For example, in the U.S. and Mexico during 2009-2015, brown pelicans experienced die-offs, anomalous feeding behavior such as the predation of common murre chicks, and poor reproductive success. The U.S. Fish and Wildlife Service, the federal agency responsible for managing brown pelicans, repeatedly expressed grave concern regarding the pelican's lack of food, unprecedented reproductive failures, and the need for fishery managers to lower fishing pressure on anchovy.

68.     California sea lions experienced large-scale die-offs in 2013, 2014, 2015, and 2016 linked to low anchovy and sardine abundance.  A study led by Fisheries Service scientists concluded that the increased mortality and starvation of California sea lion pups born at the Channel Islands was directly related to the decline of high quality forage – sardine and anchovy – available to breeding female California sea lions.

69.     In the fall of 2015, common murre chicks experienced an unprecedented die-off. Northern anchovy and Pacific sardine normally comprise about half of the common murre chicks' diet.  Researchers believe that limited prey abundance or availability was a primary cause of the die-off.

70.     A 2016 study pointed out that low anchovy numbers could be harming West Coast salmon fisheries in two ways: by limiting the number of anchovy directly available to salmon as food and by increasing predation pressure on salmon smolts by common murres trying to find alternative food.

71.     By the Fisheries Service's own estimate, the anchovy population weighed in at 31,427 metric tons in the summer of 2015.  Estimates produced by independent experts indicated the population was even lower, averaging around 24,300 metric tons between 2012 and 2015.

72.     Notwithstanding this evidence, the Fisheries Service promulgated the 2016 Catch Rule on October 26, 2016 specifying an annual catch limit and acceptable biological catch of 25,000 metric tons and overfishing limit of 100,000 metric tons.  81 Fed. Reg. 74309 (October 26, 2016). Rather than apply the most recent evidence about the size of the anchovy population, the agency in the 2016 Catch Rule adopted these values based on estimates derived from anchovy abundance data from 1964-1990, when anchovy biomass ranged as high as 1,611,800 metric tons and never fell below 299,401 metric tons.

73.     On November 23, 2016, Oceana challenged the 2016 Catch Rule for the Fisheries Service's failure to use the best scientific and commercial data available about the size of the anchovy population in establishing the overfishing limit, acceptable biological catch, and annual catch limit; its failure to demonstrate that its 25,000 metric ton catch limit would prevent overfishing when the anchovy population ranged from just above to just below that limit; and its failure to

account for the needs of predators and the marine ecosystem when setting an annual catch limit that could allow the fishery to catch most (and potentially all) of the northern anchovy remaining in the central subpopulation.

74.    The Court granted Oceana's motion for summary judgment on January 18, 2018. *Oceana v. Ross*, 2018 WL 1989575 at *16.  The Court first rejected the agency's argument that the Court lacked jurisdiction to consider Oceana's challenges to the overfishing limit and the acceptable biological catch because "Plaintiff's timely challenge to the Catch Rule also allows Plaintiff to challenge Amendment 13, and in particular the OFL and ABC values that Amendment 13 established." *Id.* at *8.  The Court reviewed the record and held that that all three of values set in the 2016 Catch Rule were arbitrary and capricious and "not based on the best scientific information available" because the Fisheries Service arbitrarily "ignore[d] the most important aspect of the problem – the size of the anchovy population." *Id.* at *15-16; 11-14.  The Court also agreed that all three levels were "too high to prevent overfishing" and determined that the agency failed to consider whether these levels "still prevented overfishing in light of their direct reliance on a MSY estimate from a 1991 study that evidence in the administrative record indicated was out of date." *Id.* at *15-16.

75.    The Court vacated the Catch Rule and remanded the matter to the agency to adopt new values for an overfishing limit, acceptable biological catch, and annual catch limit that relied on the best available science and prevented overfishing within three months. *Id.* at 16.

76.    On September 21, 2018, after it became clear that the Fisheries Service was not taking any action to develop a new rule to remedy its outdated measures, Oceana moved to enforce the January 18, 2018 summary judgment Order.  The Court granted the motion to enforce on January 19, 2019. *Oceana v. Ross*, 359 F.Supp.3d 821(N.D. Cal. 2019).  The enforcement order reiterated that the Court's original summary judgment Order "impose[d] a 90-day deadline" and determined that "Defendants have not complied with the 90-day deadline." *Id.* at 829-830.  The Court ordered the agency to promulgate a new rule no later than 90 days after the Order. *Id.* at 831.

77.    When the agency subsequently clarified that it would not comply with the notice and comment requirements of the APA in developing this new rule, the Court ordered the Fisheries

Service to publish and accept comment on a proposed rule. *Oceana v. Ross*, 5:16-cv-06784, ECF No. 82 at 5 (Feb. 25, 2019).  The parties subsequently agreed to, and the Court entered, a schedule that required the Fisheries Service to submit a proposed rule for publication in the Federal Register by April 5, 2019 and a final rule no later than May 28, 2019. *Id.*, ECF No. 84 (Mar. 1, 2019).

### The Fisheries Service's 2019 Catch Rule

78.     On May 31, 2019, the Fisheries Service published the 2019 Catch Rule establishing new values for the overfishing limit, acceptable biological catch, and annual catch limit for the central subpopulation of northern anchovy. The agency specified a value of 94,290 metric tons for the overfishing limit and 23,573 metric tons for the acceptable biological catch and annual catch limit.

79.     The Fisheries Service stated that "[t]hese reference points will remain in place until changed conditions necessitate revisions to the FMP or changes to the reference points pursuant to the existing framework." 84 Fed. Reg. at 25,197.

80.     In comments on the proposed rule, Oceana and others emphasized that establishing constant, unchanging catch limits for anchovy and leaving them in place indefinitely was contrary to basic science about anchovy populations, which has long shown that the species fluctuates significantly and rapidly, and that setting unchanging catch limits that remain in place indefinitely for fluctuating populations makes them more prone to collapse.  Oceana and others also emphasized that setting unchanging catch limits based on a relatively robust population level will fail to prevent overfishing when the population drops to significantly lower levels.

81.     Despite the best available science and the Court's holding in *Oceana v. Ross* that catch limits must be related to size of the anchovy population in order to meet the Magnuson-Stevens Act requirement to prevent overfishing, the Fisheries Service maintained that it can set unchanging catch limits that will remain in place indefinitely and simply monitor landings of anchovy against those unchanged limits—rather than monitoring actual abundance of anchovy and annually adjusting the annual catch limit based on the size of the population.

82.     The Fisheries Service derived its new catch limit values by averaging abundance estimates from the most recent three years, which reflect the highest abundance levels the population

has seen in the past decade: estimates derived from its acoustic trawl survey for 2016 (151,558 metric tons) and 2018 (723,826 metric tons), and an estimate derived from its "daily egg production method" survey for 2017 (308,173 metric tons).  The agency calculated the overfishing limit of 94,290 by averaging these three abundance estimates to arrive at a value of 394,519 metric tons and multiplying that average by an estimate of the rate of fishing mortality for anchovy at maximum sustainable yield (0.239).

83.    The best available science shows that in the past decade the only years that anchovy population weighed in above 394,519 metric tons were 2017 and 2018.  For much of the past decade—2009 through 2015—the population measured less than 100,000 metric tons.

84.    As it did in the 2016 Catch Rule, the Fisheries Service calculated the acceptable biological catch of 23,573 metric tons by reducing the overfishing limit by 75 percent, as specified in the Plan.

85.    The Fisheries Service rejected recommendations to reduce the annual catch limit below the acceptable biological catch in order to account for the anchovy's importance as a vital food source for numerous marine predators.  Instead, it set the annual catch limit equal to the acceptable biological catch (23,573 metric tons).

86.    The Fisheries Service asserted that it did not need to reduce the annual catch limit to account for the needs of marine predators, citing information on sardine predators from the 1950s through the 1980s, but omitting any mention of documented predator die-offs and breeding failures linked to low anchovy and sardine abundance in recent years.

87.    Even apart from problems associated with setting unchanging, long-term catch limits based on average biomass assumptions, the average biomass that the Fisheries Service calculated relied on a narrow subset of abundance data that does not represent the "boom and bust" cycle of the anchovy population.  The Fisheries Service based the 2019 Catch Rule of three years of data reflecting an increasing anchovy population while omitting multiple anchovy abundance estimates from years prior to 2016 during which the anchovy population was significantly lower.  Notably, the agency omitted its own abundance estimate for 2015 derived from the acoustic trawl survey, which estimated the population at 31,427 metric tons.

88.    The Fisheries Service also refused to use peer-reviewed, published average abundance estimates from independent experts or readily available estimates of maximum sustainable yield to inform their catch limits.  Unlike the average abundance value relied upon in the 2019 Catch Rule, these estimates of average abundance and maximum sustainable yield included years in which the anchovy population was low as well as more recent years when the population rebounded.  In comments on the proposed 2019 Catch Rule, Oceana showed that using any of more than half a dozen alternative average abundance estimates available to the Fisheries Service would have produced lower overfishing limits and acceptable biological catch values – ranging from 74,492 metric tons and 18,623 metric tons, respectively, down to just 6,487 metric tons and 1,622 metric tons, respectively.  These are significantly lower limits than those resulting from the circumscribed selection of data the Fisheries Service chose to rely on.

89.    The Fisheries Service took nearly 16 months after the Court's initial order on summary judgment to promulgate the 2019 Catch Rule and did so only after the court issued multiple orders compelling it to do so.  *See supra* ¶¶ 74-77.  Nonetheless, the Fisheries Service attempted to justify its decision to use very limited data by asserting that it had "limited time available to review and analyze more complex approaches for setting these reference points."  84 Fed. Reg. at 25,196.

90.    The Fisheries Service expressly implemented the Plan's "monitored" stock approach to management through the 2019 Catch Rule, including its establishment of constant catch limits that remain in place indefinitely and its approach of monitoring landings of anchovy against the catch limits instead of revisiting and revising the annual catch limit, acceptable biologic catch, and overfishing limits based on the actual abundance of anchovy in a given year.

### FIRST CLAIM FOR RELIEF
**Violation of the Magnuson-Stevens Act and the APA – 2019 Catch Rule Fails to Base Annual Catch Limit, Acceptable Biological Catch, and Overfishing Limit on the Best Available Science and Fails to Prevent Overfishing**
**(16 U.S.C. § 1851(a)(1)-(2), 1853(a)(3))**

91.    Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

92.    The Magnuson-Stevens Act requires the Fisheries Service to base the 2019 Catch

Rule "upon the best scientific information available."  16 U.S.C. § 1851(a)(2).

93.     The Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery…"  16 U.S.C. § 1851(a)(1).

94.     The Magnuson-Stevens Act requires that the Coastal Pelagic Species Fishery Management Plan "establish a mechanism for specifying annual catch limits…, implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  16 U.S.C § 1853(a)(15).

95.     The Fisheries Service failed to base the 2019 Catch Rule on the best available science regarding anchovy population dynamics, which shows that the anchovy population fluctuates significantly year to year and can drop by more than 90 percent over just two years, as it did most recently between 2005 and 2007.  Instead, the agency promulgated indefinite catch limits based on an average biomass estimate of 394,519 metric tons calculated from only three most recent years of data showing high abundance and failed to establish any mechanism for reassessing and adjusting those limits if and when the anchovy population falls significantly below that level, as it did for most of the last decade.

96.     The Fisheries Service failed to demonstrate how setting an unchanging annual catch limit for an indefinite period of time will prevent overfishing when the anchovy population falls significantly below the level the agency used as the basis to calculate the overfishing limit, acceptable biological catch, and annual catch limit.

97.     The Fisheries Service also failed to demonstrate how basing its management on unchanging overfishing limit and acceptable biological catch values that do not reflect the fact that the anchovy population can and does drop below its assumed average abundance—and even below its overfishing limit—will prevent overfishing.

98.     The Fisheries Service's decision to establish an unchanging overfishing limit, acceptable biological catch, and annual catch limit for an indefinite period of time violates both the Magnuson-Stevens Act requirement to base its regulation "upon the best scientific information available," 16 U.S.C. § 1851(a)(2), and the fundamental APA requirement that the Fisheries Service

consider all relevant factors and draw a rational connection between the facts in the record and its decision.

99.    The Fisheries Service's decision to set catch limits that do not account for the tendency of the anchovy population to fluctuate rapidly and significantly violates the Magnuson-Stevens Act requirements that all fishery conservation and management measures "shall prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery…," 16 U.S.C. § 1851(a)(1), that the annual catch limit be specified in manner such that "overfishing does not occur," *id*. at § 1853(a)(15), and the fundamental APA requirement that the Fisheries Service consider all relevant factors and draw a rational connection between the facts in the record and its decision.

100.    The Fisheries Service's 2019 Catch Rule is arbitrary and capricious and otherwise not in accordance with the Magnuson-Steven Act and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701-706.

101.    The Fisheries Service's actions and failures to act violate the Magnuson-Stevens Act and the APA, and are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

### SECOND CLAIM FOR RELIEF
**Violation of the Magnuson-Stevens Act and the APA – 2019 Catch Rule Fails to Achieve Optimum Yield by Specifying Scientifically Based Annual Catch Limit that Accounts for Needs of Marine Predators**
**(16 U.S.C. §§ 1851(a)(1), 1853(a)(3))**

102.    Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

103.    National Standard One of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery…" 16 U.S.C. § 1851(a)(1).  In establishing "optimum yield," the Fisheries Service must, among other things, "tak[e] into account the protection of marine ecosystems," and "any relevant economic, social, or ecological factor." *Id.* § 1802(33)(A)-(B).

104.    The Coastal Pelagic Species Fishery Management Plan provides that the annual catch limit for anchovy may be set equal to acceptable biological catch "or reduced by [optimum yield]

considerations." Coastal Pelagic Species FMP at 40. The 2019 Catch Rule set the annual catch limit equal to acceptable biological catch. It did not reduce the acceptable biological catch to account for optimum yield factors or provide any mechanism to trigger revision of the annual catch limit to account for optimum yield factors when scientific information shows that anchovy numbers are low or that anchovy predators are experiencing food shortages.

105.    As a result of the Fisheries Service's decision to establish an unchanging annual catch limit that does not account for ecological or socioeconomic factors, the 2019 Catch Rule establishes an annual catch limit that could leave few anchovy in the ocean to feed marine predators when the anchovy population declines to low levels.

106.    The Fisheries Service fails to explain how setting an unchanging annual catch limit accounts for the needs of marine predators when it could allow for much of the anchovy population to be caught when the population drops to low levels. In doing so, it violates the Magnuson-Stevens Act requirements that all fishery conservation and management measures shall "achiev[e] on a continuing basis, the optimum yield from each fishery…," 16 U.S.C. § 1851(a)(1), "taking into account the protection of marine ecosystems," *id.* § 1802(33)(A), and the fundamental APA requirement that the Fisheries Service consider all relevant factors and draw a rational connection between the facts in the record and its decision.

107.    The Fisheries Service's 2019 Catch Rule is arbitrary and capricious and otherwise not in accordance with the Magnuson-Steven Act and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701-706.

108.    The Fisheries Service's actions and failures to act are arbitrary and capricious, violate the Magnuson-Stevens Act and the APA, and are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
**Violation of the Magnuson-Stevens Act and the APA – Coastal Pelagic Species Fishery Management Plan that 2019 Catch Rule Implements Is Not Based on Best Available Science, Fails to Prevent Overfishing, and Fails to Achieve Optimum Yield (16 U.S.C. §§ 1851(a)(1), 1853(a)(3))**

109.    Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

110.    National Standard One of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery…" 16 U.S.C. § 1851(a)(1).

111.    The Magnuson-Stevens Act requires that the Coastal Pelagic Species Fishery Management Plan "establish a mechanism for specifying annual catch limits…, implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C § 1853(a)(15).

112.    The Magnuson-Stevens Act requires the Fisheries Service to base all conservation and management measures, including fishery management plan provisions, "upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

113.    By this action, Oceana challenges the 2019 Catch Rule and the Coastal Pelagic Species Fishery Management Plan provisions and regulations it implements. *See* 50 C.F.R. § 660.511(k)(1); 50 C.F.R. §§ 660.502, 660.508, 660.517.

114.    The 2019 Catch Rule implements provisions of the Coastal Pelagic Species Fishery Management Plan that apply to several fish populations currently labeled as "monitored stocks." The Plan states that, under this management approach, annual catch limits are "specified for multiple years until such time as the species becomes actively managed or new scientific information becomes available." CPS FMP at 40. The Plan does not specify any time frame or schedule for revisiting catch limits relative to available abundance information; nor does it require the Council or Fisheries Service to revise catch limits when available scientific information shows that a species' abundance has dropped significantly, such that the catch limits no longer bear a reasonable relationship to the actual size of the population and as a result may not prevent overfishing.

115.    Instead, the Plan only requires the agency to track landings of anchovy against the annual catch limit and make some "qualitative comparison" between landings and abundance data. Tracking landings provides a means to monitor the fishery's compliance with the annual catch limit but does nothing to ensure that the annual catch limit prevents overfishing. Nor does the Plan provide a mechanism to ensure that the catch limits that are supposed to prevent overfishing are updated or adjusted based on current abundance data.

116.    The best available science and recent experience demonstrate that anchovy experience significant, rapid population fluctuations and setting unchanging catch limits for these species greatly increases the risk of overfishing in low abundance years, as well as the risk that fishing will suppress population growth and recovery and deplete food sources for marine predators.

117.    Accordingly, the Coastal Pelagic Species Fishery Management Plan's authorization, applied in the 2019 Catch Rule, of an unchanging overfishing limit, acceptable biological catch, and annual catch limit that will remain in place indefinitely violates both the Magnuson-Stevens Act requirement that the Fisheries Service base its regulation "upon the best scientific information available," 16 U.S.C. § 1851(a)(2), and the fundamental APA requirement that the Fisheries Service consider all relevant factors and draw a rational connection between the facts in the record and its decision.

118.    The Coastal Pelagic Species Fishery Management Plan's authorization, applied in the 2019 Catch Rule, of an unchanging overfishing limit, acceptable biological catch, and annual catch limit that will remain in place indefinitely fails to prevent overfishing in years when the anchovy population declines to low levels and thus violates the Magnuson-Stevens Act requirement that all fishery conservation and management measures "shall prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery…,"  16 U.S.C. § 1851(a)(1), that the plan establish a mechanism for specifying annual catch limits such that "overfishing does not occur," *id.* at § 1853(a)(15), and the fundamental APA requirement that the Fisheries Service consider all relevant factors and draw a rational connection between the facts in the record and its decision.

119.    The Coastal Pelagic Species Fishery Management Plan's authorization, applied in the 2019 Catch Rule, of an unchanging annual catch limit that does not account for the dietary needs of marine predators, despite the Plan's admission that these species provide a critical food source to the ecosystem, violates the Magnuson-Stevens Act requirements that all fishery conservation and management measures shall "achiev[e] on a continuing basis, the optimum yield from each fishery…," 16 U.S.C. § 1851(a)(1), "taking into account the protection of marine ecosystems," *id.* § 1802(33)(A), and the fundamental APA requirement that the Fisheries Service consider all relevant factors and draw a rational connection between the facts in the record and its decision.

120.    The Coastal Pelagic Species Fishery Management Plan and regulations being implemented through the 2019 Catch Rule are arbitrary and capricious and otherwise not in accordance with the Magnuson-Steven Act and its implementing regulations, and are reviewable under the APA, 5 U.S.C. §§ 701-706.

121.    The Fisheries Service's actions and failures to act violate the Magnuson-Stevens Act and the APA, and are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**Violation of Violation of the Magnuson-Stevens Act and the APA – Failure to Use Best Available Science and Articulate a Rational Basis for the Annual Catch Limit, Acceptable Biological Catch, and Overfishing Limit**
**5 U.S.C. § 706**

122.    Plaintiff re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

123.    In addition to the fundamental problems with basing unchanging catch limits on an assumed average biomass detailed in the Claims above, the agency's selective use of only favorable data from the most recent three years to set long-term catch limits is arbitrary and capricious and violates the Magnuson-Stevens Act's requirement to base management measures on the best scientific information available.

124.    The Magnuson-Stevens Act requires the Fisheries Service to base the 2019 Catch Rule "upon the best scientific information available."  16 U.S.C. § 1851(a)(2).

125.    The Administrative Procedure Act requires that the Fisheries Service rationally explain the basis for its decision to base the 2019 Catch Rule on only three years of anchovy abundance data while omitting other available scientific data on anchovy abundance as well as available estimates of maximum sustainable yield.

126.    The Fisheries Service set the values for the overfishing limit, acceptable biological catch, and annual catch limit in the 2019 Catch Rule based on anchovy abundance estimates from 2016, 2017, and 2018.  It omitted its own abundance estimate from 2015, which showed far lower abundance.  It also omitted peer-reviewed, published abundance estimates from independent experts that provided abundance data for 2008 through 2017.

127.    The Fisheries Service also declined to consider or use estimates of maximum sustainable yield calculated by scientists from the agency itself and an expert from the Council's scientific and statistical committee to inform the values set it the 2019 Catch Rule.

128.    The Fisheries Service set unchanging catch limits intended to be in place for an indefinite period of time and to take effect in low abundance as well as high abundance years.

129.    The best available science shows that the anchovy population experiences a "boom and bust" pattern, increasing to large numbers and rapidly declining to lower numbers.  The Fisheries Service based the 2019 Catch Rule on abundance data from only the three most recent years that reflected a period of increasing abundance and excluded data from prior years when anchovy had experienced dramatically lower abundance.  The agency also chose not to use readily available estimates of maximum sustainable yield that more fully reflected both low and high anchovy abundance over time.  The agency thus established inflated catch limits by relying only on data that reflected the "boom" part of the anchovy's "boom and bust" population cycle.

130.    The agency's decision to base catch limits intended to be in place for an indefinite period, during periods of both low and high abundance, only on data reflecting higher anchovy abundance is arbitrary and capricious and not based on the best available science.

131.    The Fisheries Service's failure to offer a rational, lawful explanation why it chose to use a narrow subset of abundance data only from the three most recent years when anchovy were more abundant but chose to exclude data from prior years when anchovy were far less abundant, and why it chose not to use readily available estimates of maximum sustainable yield, violates the Magnuson-Stevens Act and APA.

132.    The Fisheries Service's 2019 Catch Rule is arbitrary and capricious and otherwise not in accordance with the Magnuson-Steven Act and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701-706.

133.    The Fisheries Service's actions and failures to act violate the Magnuson-Stevens Act and the APA, and are causing irreparable injury to the Plaintiff for which it has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.      Declare that Defendants have violated the Magnuson-Stevens Act and the APA as described above because the 2019 Catch Rule is not based on the best scientific information available, fails to prevent overfishing and achieve optimum yield, and is arbitrary and capricious and not in accordance with law;

B.      Declare that Defendants have violated the Magnuson-Stevens Act and the APA as described above because the Coastal Pelagic Species Fishery Management Plan provisions applied in the 2019 Catch Rule are not based on the best scientific information available, fail to prevent overfishing and achieve optimum yield, and are arbitrary and capricious and not in accordance with law;

C.      Vacate the 2019 Catch Rule;

D.      Vacate the Coastal Pelagic Species Fishery Management Plan provisions and regulations that the 2019 Catch Rule implements;

E.      Remand the 2019 Catch Rule to Defendants for completion of a new rule that replaces the 2019 Catch Rule and complies with the Magnuson-Stevens Act and the APA within no more than three months from the date of the entry of judgment;

F.      Remand the Coastal Pelagic Species Fishery Management Plan to Defendants for completion of a fishery management plan amendment that eliminates the Coastal Pelagic Species Fishery Management Plan provisions applied in the 2019 Catch Rule and brings the Plan into full compliance with the Magnuson-Stevens Act and the APA within no more than one year from the date of the entry of judgment.

G.      Maintain jurisdiction over this action until Defendants are in compliance with the Magnuson-Stevens Act, the APA, and every order of this Court;

H.      Award Plaintiff its costs of litigation, including reasonable attorney and expert witness fees.

I.      Grant Plaintiff such further and additional relief as the Court may deem just and proper.


DATED: June 28, 2019                     /s/ Andrea A. Treece
                                         Andrea A. Treece (State Bar No. 237639)
                                         Earthjustice
                                         50 California Street, Suite 500
                                         San Francisco, CA  94111
                                         T: 415-217-2000 / F: 415-217-2040
                                         Email: atreece@earthjustice.org

                                         Stephen D. Mashuda (*Pro Hac Vice forthcoming*)
                                         Earthjustice
                                         705 Second Avenue, Suite 203
                                         Seattle, WA 98104
                                         T: 206-343-7340 / F: 206-343-1526
                                         Email: smashuda@earthjustice.org

                                         *Counsel for Plaintiff*