Paul S. Weiland (CA Bar No. 237058)
NOSSAMAN LLP
18101 Von Karman Avenue, Suite 1800
Irvine, CA 92612
Telephone: (949) 477-7644
Facsimile: (949) 833-7878
pweiland@nossaman.com

Linda R. Larson, *pro hac vice*
NOSSAMAN LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: (206) 395-7633
Facsimile: (206) 257-0780
llarson@nossaman.com

*Attorneys for Intervenor-Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN JOSE)

| | |
|---|---|
| OCEANA, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>WILBUR L. ROSS, *In His Official Capacity As Secretary Of Commerce*, et al.,<br><br>          Defendants,<br><br>CALIFORNIA WETFISH PRODUCERS ASSOCIATION and MONTEREY FISH COMPANY, INC.<br><br>          Intervenor-Defendants. | Case No: 5:19-cv-03809-LHK<br><br>**INTERVENOR-DEFENDANTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**<br><br>Hearing Date  :  June 25, 2020<br>Time          :  1:30 p.m.<br>Courtroom     :  8<br>Judge         :  Hon. Lucy H. Koh |

# **TABLE OF CONTENTS**

A.      INTRODUCTION...................................................................................................1

B.      OCEANA RELIES ON CONJECTURE, NOT THE ADMINISTRATIVE RECORD.
        ...............................................................................................................................1

    **1.**      The anchovy fishery is not overfished. ............................................1

    **2.**      It is unreasonable to assume future overfishing under the 2019 Rule. ...........2

    **3.**      Oceana misrepresents the current California wetfish fishery. ........................3

C.      THE MSA'S OVERFISHING PROVISIONS DO NOT APPLY TO THE
        ANCHOVY FISHERY. ..........................................................................................4

D.      OCEANA'S SCIENCE IS NOT BETTER, NOR WAS IT IGNORED BY NMFS. ..7

    **1.**      NMFS reasonably concluded that estimates by McCall and Thayer were not
        reliable for management purposes. ...................................................8

    **2.**      Oceana misrepresents the science. ..................................................9

E.      CONCLUSION. ....................................................................................................10

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Citizens to Preserve Overton Park, Inc. v. Vople*,
5
   401 U.S. 402 (1971) ...................................................................................................10

6

*Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*,
   2016 WL 4382604 (N.D. Cal. 2016)............................................................................9

7

*Flaherty v. Bryson*,
8
   850 F. Supp. 2d 38 (D.D.C. 2012) ......................................................................1, 5, 6

9

*Flaherty v. Pritzker*,
   195 F. Supp. 3d 136 (D.D.C. 2016) ....................................................................6, 7, 9

10

*Greenpeace Action v. Franklin*,
11
   14 F.3d 1324 (9th Cir. 1992)........................................................................................7

12

*Lands Council v. McNair*,
13
   629 F.3d 1070 (9th Cir. 2010)......................................................................................7

14

*Midwater Trawlers Co-operative v. Dep't of Commerce*,
   282 F.3d 710 (9th Cir. 2002)........................................................................................4

15

*Natural Resources Defense Council v. NMFS*,
16
   421 F.3d 872 (9th Cir. 2005)........................................................................................4

17

*Oceana, Inc. v. Ross*,
   363 F. Supp. 3d 67 (D.D.C. 2019) ......................................................................1, 5, 9

18

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
19
   747 F.3d 581 (9th Cir. 2014)....................................................................................8, 10

20

*Sierra Club v. Morton*,
21
   405 U.S. 727 (1972) ......................................................................................................1

22

**Federal Statutes**

23

Magnuson Stevens Act
   16 U.S.C. § 1801(b)(3)..................................................................................................4
24
   16 U.S.C. § 1802(5).......................................................................................................4
   16 U.S.C. § 1802(34).....................................................................................................5
25
   16 U.S.C. § 1854(e).......................................................................................................5

26

Administrative Procedure Act
27
   5 U.S.C. § 702 ...............................................................................................................1

28

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1

**Other Authorities**

2    50 C.F.R. § 600.310(f)(2)..............................................................................................................6

3    50 C.F.R. § 600.310(f)(4)(iv).......................................................................................................7

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1    **A.**     **Introduction.**

2       Oceana errs on both the law and the facts. Its challenge amounts to nothing more than its entirely

3 unsupported prediction that, at some point in the future, the anchovy fishery will inevitably be overfished

4 under the reference points for the California anchovy fishery established by the National Marine Fishery

5 Service ("NMFS") in 2019 ("the 2019 Rule"). There is <u>no</u> record evidence that the anchovy fishery is

6 now overfished or that it is on the verge of overfishing; in fact, the record unequivocally shows a small,

7 sustainable fishery that NMFS reasonably concluded would continue to be sustainable under the 2019

8 Rule. Oceana points to no record evidence demonstrating a causal connection between the extremely low

9 exploitation rates allowed under the 2019 Rule and anchovy's natural cycles of abundance. Oceana's

10 legal theory---that the Magnuson–Stevens Fishery Conservation and Management Act ("MSA") requires

11 NMFS to manage even sustainable fisheries as though they were overfished---is based on a fundamental

12 misreading of the MSA. "Oceana's narrow focus on [annual catch limits] and accompanying

13 [accountability measures] without reference to overfishing misses the sea for the kelp." *Oceana, Inc. v.*

14 *Ross*, 363 F. Supp. 3d 67, 86 (D.D.C. 2019).

15       Oceana must show, based on record evidence, not surmise and policy positions, that NMFS'

16 decisions in the 2019 Rule were arbitrary and capricious. Oceana has not met its burden to do so. Its

17 entire case rests on speculation, not the administrative record. This is far from sufficient to overturn the

18 2019 Rule. *See Sierra Club v. Morton*, 405 U.S. 727, 740 (1972) (holding that the burden is on the party

19 seeking review under § 702 of the Administrative Procedure Act ("APA") to set forth specific facts

20 showing that it has satisfied its terms.). The Court should deny Oceana's motion and grant Intervenors'

21 motion for summary judgment.

22    **B.**     **Oceana relies on conjecture, not the administrative record.**

23       Oceana's house of cards rests on unsupported conjecture. Oceana ignores key facts about the

24 fishery and the ecosystem fatal to its challenge. Oceana has "made no showing other than that the agency

25 did not select their favored control rule." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 63 (D.D.C. 2012).

26       **1.**     **The anchovy fishery is not overfished.**

27       NMFS' assessment of the state of the anchovy fishery is unequivocal: it is not overfished or

28 approaching an overfished condition. AR 264: 0016391. Oceana does not dispute this finding. Yet

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

Oceana misleadingly and histrionically uses the word "collapse" with respect to anchovy 25 times in its response.  ECF 71.  There is no evidence that the anchovy stock is on the verge of collapse because of fishing.  The record shows that (1) the anchovy stock is currently at record high levels of abundance and (2) anchovy predators, such as brown pelicans and California sea lions, are flourishing as the entire ecosystem recovers from a warm, low productivity ocean cycle.  ECF 70-4; 2019 Supp. 1 AR 1; AR 408: 1912.

Oceana establishes no causal connection between the small amounts of anchovy currently harvested and anchovy cycles of abundance caused by environmental conditions.  The modern commercial fishery is <u>not</u> the much larger historical reduction fishery, as Oceana falsely asserts.  ECF 71 at 25, 29.  The reduction fishery ended in 1982, and the active management regime for that high volume fishery also ended because it was no longer necessary for a fishery that now takes less than one percent of the resource.  2016 AR 165; AR 62: 001278; AR 413: 19296.  Far from showing a fishery perpetually on the verge of collapse, the historical data in the record unequivocally document that anchovy stocks consistently rebounded from periods of low abundance even in the presence of much more intense fishing than now takes place.  AR 348: 17976; AR 408: 19212.  Moreover, the amounts that the 2019 Rule allows to be harvested by fishermen pale in comparison to the amounts consumed by predators.  AR 315 at 0017425; AR 348: 0017975.  NMFS reasonably concluded that the commercial fishery is simply not large enough to impact predators at the level of catch allowed in the 2019 Rule.  AR 264: 0016391 ("[T]here is no direct evidence that the current or new fishing levels are having direct competition effects on species that feed on northern anchovy.")

> **2.** **It is unreasonable to assume future overfishing under the 2019 Rule.**

No reasonable inferences can be drawn from record evidence to support Oceana's prediction that overfishing will inevitably occur if the biomass dips below 98,629 metric tons ("mt").  ECF 71 at 12-13.  What the record does clearly show is that, not surprisingly, anchovy landings mirror biomass, going down when the natural abundance cycle goes down.  AR 38: 1116, AR 165: 2879; AR 315: 0017427, 0017438.  Post-1982 landings have consistently declined with stock biomass and remain very low, as shown by the red line in the chart below.  Landings have never exceeded annual catch limits for the last four decades, and in most years have been less than half of the amount authorized.

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1
2
3
4
5
6
7
8
9



10   AR 315: 0017427.   The undisputed low levels of landings over many decades are sufficient alone for

11   NMFS to infer that future catch levels will remain low and that any unexpected increased harvest levels

12   can be managed proactively and decisively by shutting down the fishery.   *See* AR 264: 0016387.

13          There is no reasonable basis to deduce that future fishing behavior will drastically change,

14   whatever the size of the anchovy stock.   Fishermen do not go out to chase after fish that are not there; it

15   defies common sense and basic economics to insinuate that they would.   In addition, anchovy fishermen

16   are geographically limited to fishing near offloading facilities, and such facilities are now rare in

17   California.   AR 315: 0017444.   There is absolutely no record evidence to suggest that these fishing

18   realities will change and drastically increase fishing pressure in periods of low abundance.

19          **3.       Oceana misrepresents the current California wetfish fishery.**

20          Oceana more or less admits that its goal is to end commercial fishing for anchovy.   ECF 71 at 26

21   n. 11.   Oceana argues that the greatest benefit for the nation would be achieved by a "very small annual

22   catch limit" or no commercial fishery at all.   *Id.*   This contention ignores the fact that 2019 Rule *already*

23   establishes a "very small catch limit" --- Acceptable Biological Catch ("ABC") is set at 0.25% of

24   Maximum Sustainable Yield ("MSY").   Oceana's only evidence is its bias against commercial fishing, not

25   the record or the MSA.   It is not true as Oceana broadly asserts that the "anchovy caught off the West

26   Coast" are not used for human consumption.   ECF 71 at 25.   Fish meal production is long gone from

27   California.   AR 315: 0017443.   Anchovy is now used for human consumption, bait, and animal feed,

28   depending on the time of year and oil content.   2016 AR 165: 2878.

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

Moreover, the anchovy fishery is a crucial component of the "four legged stool" of anchovy, market squid, Pacific mackerel and sardine that the historic California wetfish fleet relies on to survive. AR 315: 0017442-43.  In turn, small coastal communities such as Half Moon Bay, Moss Landing, and Monterey rely on the wetfish fleet to support critical berthing, mooring and processing infrastructure that will be permanently lost if catch levels decline to very low levels.  AR 315: 0017442-45.  For example, in Monterey, the processors and the fleet rely on anchovy for at least six months per year (when squid and other coastal pelagic species are not available) to keep 1,300 people employed and the doors open.  *Id.* The MSA supports, not devalues, heritage fisheries and fishing-dependent communities.  *See, e.g.*, 16 U.S.C. § 1801(b)(3) (purpose of act is "to promote domestic commercial and recreational fishing under sound conservation and management principles"); *id.* § 1851(a)(8) (conservation and management measures shall provide for the sustained participation of fishing communities).

In the very broadest sense, the MSA regulates fishing in the United States.  The basic purposes of the MSA were to establish an exclusive fisheries zone from 12 to 200 miles off the United States, "and to provide for management of fishing within the 200-mile zone."  *Midwater Trawlers Co-operative v. Dep't of Commerce,* 282 F.3d 710, 715 (9th Cir. 2002) (internal citations and quotations omitted).  Oceana improperly seeks to write the regulated community out of California and the MSA.[1]

**C.     The MSA's overfishing provisions do not apply to the anchovy fishery.**

Oceana's legal arguments fundamentally fail because the anchovy fishery is not overfished, and therefore rebuilding provisions of the MSA do not apply to the 2019 Rule.  In addition, Oceana's extreme view of the MSA is not supported by the statute itself or case law applicable to fisheries that are not overfished.

Oceana spends many pages speculating about potential overfishing and discussing the MSA's measures for dealing with overfishing.  ECF 71 at 12-24.  The fundamental problem with Oceana's arguments is that the anchovy fishery *is not overfished*.  Consequently, the majority of authority relied upon by Oceana is irrelevant because it pertains to overfished fisheries.  Oceana's real thesis is that if there is any possibility, no matter how remote or theoretical, that a stock will be overfished at any time in

---

[1] Oceana presents a false "conservation v. fishing" dichotomy.  ECF 71 at 32.  "[T]he longer-term economic interests of fishing communities are aligned with the conservation goals set forth in the Act." *Natural Resources Defense Council v. NMFS,* 421 F.3d 872, 879 (9th Cir. 2005); *see* 16 U.S.C. § 1802(5).

the future, the agency is legally compelled by the MSA to ratchet down or eliminate commercial fishing in anticipation of such a possibility.  ECF 71 at 23.  It is Oceana, not NMFS, which is attempting to re-write the law.

Oceana seizes upon the use of the word "immediately" in the MSA to jump to the fallacy that NMFS is required to stop fishing because a stock with large natural fluctuations will at some point return to low abundance.  ECF 71 at 23 n.9.  Setting aside the fact it is uncontroverted that the anchovy fishery is not overfished (so that there is nothing for NMFS to end "immediately"), the section of the statute that Oceana relies upon explicitly applies to "a fishery that is overfished" -- a determination that is made by the agency through a specific statutory process according to the statutory definition of overfishing.  16 U.S.C. § 1854(e)(3)-(4).  The agency's statutory obligations are to (1) implement rebuilding plans for a fishery *after* NMFS has identified the fishery as being in an overfished condition and (2) "prevent overfishing from occurring in the fishery whenever such fishery is identified as approaching an overfished condition."  *Id.* § 1854(e)(3)(A)-(B).  The record is unequivocal that absolutely no such identification has been made by the agency with respect to the California anchovy fishery, either now or in the past.  Moreover, 16 U.S.C. § 1854(e)(3)(A) "must be read in light of the broader statutory scheme, not in isolation.  And other elements of the MSA show that the Fisheries Service cannot pursue an end to overfishing irrespective of collateral consequences."  *Oceana*, 363 F. Supp. 3d at 90; *see also* ECF 63 at 4-9.

Oceana improperly brushes aside the MSA's extensive regulatory structure devoted to curing overfishing *after* it happens.  Congress clearly anticipated that overfishing could occur despite the active management of fisheries by specifying the steps needed to rebuild overfished stocks when necessary.  16 U.S.C. § 1854(e) ("Rebuilding Overfished Fisheries").  Oceana ignores the plain language of the statute--- which directs the agency to end overfishing, not *all* fishing.  *Id.* § 1854(e)(3) (agency is to prepare a plan or regulations "to end overfishing").  The existence of an Annual Catch Limit ("ACL") overage does not automatically mean that overfishing is occurring.  *See* 16 U.S.C. § 1802(34) (defining overfishing as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."); *Flaherty v. Bryson*, 850 F. Supp.2d at 66.

Notably, Oceana does not dispute that the MSA guidelines allow NMFS to implement harvest

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1    levels that it estimates have only a 50% chance of preventing overfishing.  50 C.F.R. § 600.310(f)(2)

2    (requiring Acceptable Biological Catch ("ABC") control rules with at least a 50% probability that an

3    Overfishing Limit ("OFL") will be not exceeded).  The level of uncertainty allowed by this provision---a

4    50/50 chance that overfishing may occur---is completely at odds with Oceana's view that the MSA has

5    zero prospective tolerance for overfishing.

6          The National Standard 1 guidelines do not require NMFS to guarantee that catch will never exceed

7    an ACL.  The guidelines state that a "multiyear plan must include a mechanism for specifying ACLs for

8    each year with appropriate AMs [management controls] to prevent overfishing . . . A multiyear plan must

9    provide that, if an ACL is exceeded for a year, then AMs are implemented *for the next year*."  *Id.* §

10   600.310(f)(4)(i) (emphasis supplied).  "Such AMs would hardly be necessary if NMFS was under an

11   obligation to guarantee that overages never occur."  *Flaherty v. Bryson*, 850 F. Supp.2d at 66.

12         There is no requirement in the MSA or the guidelines that compels the *recalculation* of an ACL

13   every calendar year and Oceana points to none.  An ACL is a measurement that sets a ceiling for harvest

14   levels, not a yearly scientific process.  It is republished on an annual basis before the start of each new

15   anchovy fishing season through the harvest specification process set out in the Coastal Pelagic Species

16   Fishery Management Plan.  ECF 63 at 3.  The anchovy ACL can and will be changed for an upcoming

17   fishing season when the best available science indicates that it should be.[2]

18         Oceana makes no attempt to distinguish the controlling cases cited by Intervenors which have

19   upheld (1) the use of constant catch rates for forage fish and (2) substantially smaller scientific uncertainty

20   buffers than the 75% buffer established for the anchovy fishery.  *See* ECF 63 at 8-9, 13.  For example, in

21   *Flaherty v. Pritzker*, 195 F. Supp.3d 136 (D.D.C. 2016), the court rejected arguments that a constant catch

22   level for Atlantic herring failed to consider the risk of overfishing and take scientific uncertainty into

23   consideration, noting that herring was not overfished nor subject to overfishing.  "It is not enough that

24   Plaintiffs would have preferred an ACL or ABC control rule that preserved a greater stock of Atlantic

25   herring.  Plaintiffs have not provided any evidence to suggest that the ACL will permit overfishing, other

26   than arguing that the ACL would have been lower had forage considerations been sufficiently accounted

27

28
───────────────────────
[2] Intervenors do not concede that Oceana is entitled to file perpetual, repetitive challenges to Amendment
13, and join in Defendants' arguments regarding the untimeliness of the current challenge.

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1  for." *Id.* at 147.  That is exactly Oceana's argument here.

2         Oceana repeats its policy position that predators should have priority over all other considerations

3  in determining allowable catch.  ECF 71 at 25-26.  No such priority is legally compelled.  The MSA

4  guidelines explicitly direct the agency to consider ecological factors on an equal footing with socio-

5  economic factors to arrive at optimum yield ("OY").  50 C.F.R. § 600.310(f)(4)(iv) (councils have the

6  discretion to set catch levels lower "to account for ecological, economic, and social factors").  Predator

7  needs are an ecological factor which is *considered,* not elevated, in deriving OY.  The record shows that

8  NMFS did in fact consider all of these factors in developing the 2019 Rule.  ECF 63 at 14-15.  NMFS did

9  not make any adjustments based on socio-economic considerations.  AR 264: 0016387 ("As for setting the

10  ACL at a level lower than ABC for OY considerations, no probative information has been presented that

11  requires reductions in the ACL based on economic or social reasons.").  NMFS did consider predator

12  needs in developing the 2019 Rule based on the most recent information, not the older information from

13  the 2016 administrative record that Oceana repeatedly cites.  2019 Supp. 1 AR 1.  Oceana merely

14  disagrees with NMFS' expert judgement and inferences, not the facts.  This does not render NMFS'

15  decision arbitrary and capricious.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992)

16  (disagreement with agency's analysis "is not a sufficient basis for [the court] to conclude that the

17  [agency's] action was arbitrary or capricious.").

18  **D.     Oceana's science is not better, nor was it ignored by NMFS.**

19         Oceana again touts minority scientific views as the best available science.  Not only are Oceana's

20  favored papers and data not endorsed by the Scientific and Statistical Committee and other independent

21  scientists, but each piece of information was carefully considered by NMFS and weighed lower than other

22  available information.  ECF 63 at 12-13.  The Ninth Circuit has consistently held that it is not the role of

23  the courts to choose among scientific studies or to instruct the agency to favor one study over another,

24  particularly when reviewing an agency's scientific predictions.  *Lands Council v. McNair*, 629 F.3d 1070,

25  1074 (9th Cir. 2010).  An agency's decision "is entitled to a presumption of regularity" and courts are not

26  to substitute their judgment for that of the agency.  "Where the agency has relied on relevant evidence

27  such that a reasonable mind might accept as adequate to support a conclusion, its decision is supported by

28  substantial evidence.  Even if the evidence is susceptible of more than one rational interpretation, the court

7

1   must uphold the agency's findings." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601

2   (9th Cir. 2014) (internal citations and quotations omitted).

3        **1.        NMFS reasonably concluded that estimates by McCall and Thayer were not  reliable**
             **for management purposes.**

4

5        Oceana incorrectly contends that biomass estimates by Thayer are the best available science that

6   trump all other information before the agency.  ECF 71 at 8-11.  Oceana misrepresents both the reliability

7   of the McCall/Thayer methodology and the significance of the 2015 estimates.  Many young anchovy do

8   not spawn in their first year; spawning biomass can be considerably less than the total population.  2016

9   AR 145; AR 416: 0019339.   If the population is mostly composed of old fish, the biomass may be

10  underestimated by only a small percentage.  If the recruiting age 1 anchovy year-class is strong, spawning

11  biomass could be less than 30% of the total biomass.  2019 Supp. AR 50: 0020974.  Oceana correctly

12  points out the "high proportion of immature anchovy in trawl samples" in the 2015 survey.  ECF 71 at

13  9.  Thus, there is evidence that the 2015 spawning biomass was only a fraction of the total biomass.

14       However, Dr. Thayer's original 2015 estimate of 5,300 mt of spawning biomass was derived from

15  only one survey at the beginning of the spawning season.  Oceana fails to mention that a second estimate

16  of 178,900 mt was calculated from a second survey near the end of the spawning season.  The average of

17  the two estimates was 92,100 mt.  The widely-varying estimates from the two 2015 surveys demonstrate

18  why it was unreasonable to use the Thayer spawning biomass estimates for management.   AR 412:

19  019272-73; AR 409.  Which biomass estimate is the most accurate:  the winter survey, the spring survey

20  or the average of the two?

21       There are two possible reasons for the huge difference between the estimates of the two surveys in

22  2015.  The timing of anchovy spawning season is environment-dependent and the first survey likely began

23  before the anchovy started spawning.  AR 412: 019272.  If this was the case, then the best estimate of the

24  spawning biomass is 178,900 mt.   It is also possible that either the sampling and/or analytical

25  methodology in the Thayer study is so variable that accurate estimation of the spawning biomass with the

26  McCall/Thayer methodology is impossible. In that case, neither of the survey estimates is valid.

27  Averaging two invalid estimates is hardly the best available science.  AR 409; AR 272:0016420-21.

28       Oceana's real complaint is that the agency should have drawn different inferences about the

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

reliability of the available data sets.  That is not sufficient to overturn an agency decision under the APA, MSA or the Endangered Species Act.  *See Defenders of Wildlife v. U.S. Fish & Wildlife Serv*., 2016 WL 4382604, at *24 (N.D. Cal. 2016) ("Plaintiffs disagree with how FWS weighed the relevant scientific data.").  Based on their preferred inferences, Oceana asks the Court to reinstate the unnecessary past management measures for the larger defunct reduction fishery.  ECF 71 at 29-30.  But those decisions are left to the expert agency, "so long as the agency does so in a manner reasonably consistent with its statutory mandate."  *Oceana*, 363 F. Supp. 3d at 90; *see Flaherty v. Pritzker*, 195 F. Supp. 3d at 152.

> **2.**      **Oceana misrepresents the science.**

Oceana theorizes "that fishing even a relatively small amount of anchovy could exacerbate natural declines in the anchovy population and adversely affect dependent predators in years when the anchovy population is very low."  ECF 71 at 28.  There are at least two things wrong with this speculation.  First, there is no record evidence that the anchovy fishery has exacerbated past natural declines in abundance.  Even McCall and Thayer, Oceana's favored researchers, agree:  "Remarkably, this decline [from 2005-2011] occurred in the near-absence of fishing and therefore must be considered a natural phenomenon."  AR 417:  0019377.  Indeed, one of the papers that Oceana relies on excluded small pelagics such as anchovy from its study of the impacts of fishing, "since those species are known to fluctuate strongly."  AR 282: 0016578 (Pinsky and Byler 2015).  Second, the papers relied upon by Oceana for the proposition that fishing causes stocks to collapse examined fisheries where the exploitation rate was at or above MSY.  *See, e.g.*, AR 282: 001678-79.  These papers should be afforded little or no weight with respect to the management of a fishery fished at .25% of MSY.

Oceana also selectively quotes from a paper by McClatchie in another attempt to establish the inevitability of future overfishing.  Oceana speciously implies that Dr. McClatchie agrees that if fishing did not take place at the levels allowed under the 2019 Rule, anchovy would no longer reach the low levels seen in the past.  ECF 71 at 28.  Dr. McClathie concluded to the contrary:

> Finally, while it is recognized that fishing pressure on pelagic forage fish can increase the probability, and even the rate, of stock collapse, it is well documented that forage fish populations collapse repeatedly and these collapses are a common feature of sardine and anchovy population dynamics, *even in the absence of commercial fishing*.  The inescapable conclusion, from long time series palaeoceangraphic studies, is that sardine and anchovy populations are not stable, and so it is not possible to restore them to some stable pre-fishery level, because it does not exist.

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1  AR 348: 0017976 (internal citations omitted; emphasis supplied).  Dr. McClatchie also observed that "in

2  recent years, the largest removals of forage fish in the California Current System are by demersal fish,

3  marine mammals, seabirds and then fisheries, arranged in order of magnitude."  *Id.* at 0017975.

4      The overwhelming scientific consensus in the record is that environmental conditions drive

5  anchovy abundance cycles, not recent harvest levels.  AR 264: 16391; AR 398: 19024; AR 348; AR 410:

6  0019218-20.  Even the scientists favored by Oceana agree that ocean conditions, not fishing, are in the

7  driver seat when it comes to anchovy biomass levels.  *See, e.g.*, AR 282: 0016578 ("The influences of

8  climate on marine population dynamics appear widespread . . . temperature effects on population

9  dynamics are common."); 2016 AR 202 (during the 1980s anchovy abundance started to decline as

10  environmental conditions in the California current ecosystem became less favorable).  Oceana failed to

11  show, based on record evidence, that fishing under the 2019 Rule will cause overfishing.  There is no

12  credible evidence, in light of the totality of the record, that overfishing will occur in this small,

13  sustainable, heritage fishery.

14  **E.    Conclusion.**

15      Oceana's theory that catch under the 2019 Rule will cause overfishing is not supported by the

16  record.   Its assertion that NMFS will stand by and allow the fishery to become overfished is legally

17  unsupported.  NMFS is authorized by the MSA to take action if and when harvest levels approach the

18  overfishing level, and is entitled to a legal presumption that it will exercise that authority.  *See Citizens to*

19  *Preserve Overton Park, Inc. v. Vople*, 401 U.S. 402, 415 (1971); *San Luis & Delta Mendota Water Auth.*,

20  747 F.3d at 601.  Oceana's challenge is not supported by record evidence or law.  Intervenors respectfully

21  request the Court to grant their motion for summary judgment.

22

23      Dated: June 11, 2020           Respectfully submitted,

24                                     NOSSAMAN LLP

25

26                                     */s/ Linda R. Larson*
                                       Linda R. Larson (WA Bar No. 9171), *pro hac vice*
27                                     Paul S. Weiland (CA Bar No. 237058)
                                       *Attorneys for Intervenor-Defendants*
28

INTERVENORS' REPLY
CASE NO: 5:19-CV-03809 LHK

1

2

## <u>CERTIFICATE OF SERVICE</u>

3

4         I hereby certify that on June 11, 2020, I electronically filed the document to which this Certificate

5    of Service is attached with the Clerk of the Court using the CM/ECF System, which will send notification

     of such filing to all counsel of record.

6

7                                    */s/ Linda R. Larson*
                                     Linda R. Larson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28