JEAN E. WILLIAMS
Deputy Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief
CLIFFORD E. STEVENS, JR., Senior Trial Attorney
DC Bar Number 463906
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 353-7548
Facsimile: (202) 305-0275
Email: clifford.stevens@usdoj.gov
*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| OCEANA, INC., | ) |
| Plaintiff, | ) No. 5:19-cv-03809-LHK-SVK |
| v. | ) **REPLY IN SUPPORT OF DEFENDANTS'** |
| WILBUR ROSS, et al., | ) **CROSS-MOTION FOR SUMMARY** |
| Defendants, | ) **JUDGMENT** |
| and | ) Date: June 25, 2020 |
| CALIFORNIA WETFISH PRODUCERS | ) Time: 1:30 p.m. |
| ASSOCIATION, et al. | ) Courtroom: 8, 4th Floor (San Jose) |
| Defendant-Intervenors. | ) The Honorable Lucy H. Koh |

## TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

I.     NMFS Reasonably Found That "Overfishing" Was Not Likely Under the
       Rule ........................................................................................................................2

II.    Plaintiff Is Not Entitled To A Presumption That NMFS Will Not Fulfill Its
       Obligations Under the Magnuson Act .................................................................10

III.   NMFS Relied On the Best Available Data for Setting the Catch Limit .............12

IV.    NMFS Plainly Considered Predator Consumption, and Nothing More Is
       Required by the Act .............................................................................................12

V.     Even If The Court Reaches Plaintiff's Untimely Challenge to the FMP,
       Plaintiff Has Not Shown the Challenged Provisions Are Unlawful ...................13

VI.    Plaintiff Seeks an Unlawful Remedy That Would Dictate The Substance
       of Agency Action on Remand .............................................................................15

CONCLUSION..................................................................................................................15

1

## TABLE OF AUTHORITIES

2

CASES                                                                        PAGE

3

4

*Alaska Center for the Environment v. Reilly*,
5     796 F. Supp. 1374 (W.D. Wash. 1992)................................................................. 15
*Alaska Ctr. for the Env't v. Browner*,
6     20 F.3d 981 (9th Cir. 1994) .................................................................................. 15
*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
7     462 U.S. 87 (1983) ................................................................................................. 4
*Flaherty v. Pritzker*,
8     195 F. Supp. 3d 136 (D.D.C. 2016) .................................................................. 5, 6
*Innova Sols. v. Baran*,
9     399 F. Supp. 3d 1004 (N.D. Cal. 2019) ................................................................ 9
*Lands Council v. Vaught*,
10    198 F. Supp. 2d 1211 (E.D. Wash. 2002) ............................................................. 4
11
*Massachusetts v. Pritzker*,
12    10 F. Supp. 3d 208 (D. Mass. 2014) ..................................................................... 9
*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
13    463 U.S. 29 (1983) ................................................................................................. 5
*National Wildlife Federation v. NMFS*,
14    524 F.3d 917 (9th Cir. 2008) ............................................................................... 15
15
*Nat'l Coal. for Marine Conservation v. Evans*,
16    231 F. Supp. 2d 119 (D.D.C. 2002) ............................................................... 13, 14
*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
17    817 F. Supp. 2d 1290 (D. Or. 2011) .............................................................. 11, 12
*Preston v. Heckler*,
18    734 F.2d 1359 (9th Cir. 1984) ............................................................................... 4
*Red Top Mercury Mines v. United States*,
19    887 F.2d 198 (9th Cir. 1989) ............................................................................... 11
20
*San Luis & Delta-Mendota Water Auth. v. Jewell*,
21    747 F.3d 581 (9th Cir. 2014) ............................................................................. 4, 9
*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
22    435 U.S. 519 (1978) ............................................................................................... 9

23

STATUTES

24    16 U.S.C. § 1802(34) ...................................................................................... 1, 3, 5
      16 U.S.C. § 1854(e)(3) ......................................................................................... 10
25    16 U.S.C. § 1855(f)(1) .......................................................................................... 14

26

27

28

FEDERAL REGULATIONS

50 C.F.R. § 600.310(e)(2)(ii)(A)(3) ................................................................................................. 6
50 C.F.R. § 600.310(e)(2)(ii)(A)(2) ................................................................................................. 6
50 C.F.R. § 600.310(e)(1)(i)(A) ................................................................................................. 5, 9
50 C.F.R. § 600.310(e)(2)(ii)(A)(1)-(3) ............................................................................................. 5
50 C.F.R. § 600.310(e)(3)(iii)(A) ................................................................................................. 12
50 C.F.R. § 600.310(e)(3)(iii)(B)(3) ............................................................................................. 12
50 C.F.R. § 600.310(f)(1)(ii) ....................................................................................................... 13

OTHER AUTHORITIES

81 Fed. Reg. 71,858, 71,859 (Oct. 18, 2016) .................................................................................. 6

# INTRODUCTION

Plaintiff's theory that "overfishing" of anchovy will occur under the challenged rule is simply not supported by the scientific evidence that has become available since the prior anchovy case.  AR 264: 16390-16391 ("Rule").  As explained in Defendants' opening brief and further below, the National Marine Fisheries Service ("NMFS") reasonably found based on the record evidence that "overfishing" was not likely within the meaning of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act" or "Act").  Among other things, NMFS found that the recent recovery of the stock confirmed that "overfishing," i.e., jeopardy to the long-term capacity of the stock to be harvested at maximum sustainable yield on average over time, was not likely even if the stock were to decline in the future to the unusually low biomass levels calculated by MacCall/Thayer for 2009-15.  ECF No. 64 ("Fed. Br.") at 2, 15-16 (citing AR 264:16390-16391 (carryover paragraph)); 16 U.S.C. § 1802(34).

Plaintiff's arguments on reply as to "optimum yield" are similarly unavailing.  As Plaintiff does not seriously dispute, the Act only requires consideration of ecological factors such as predator consumption, and the administrative record is clear that NMFS considered this issue. The Magnuson Act does not require NMFS or the Pacific Fishery Management Council ("Council") to draw any particular or explicit balance between fishing and predator consumption. As to Plaintiff's challenge to the provisions of the fishery management plan ("FMP"), Plaintiff does not offer any serious rebuttal to Defendants' argument that the plain language of the Act does not contemplate Plaintiff's untimely challenge. Fed. Br. at 22.  In any event, Plaintiff's challenge to the FMP fails.  NMFS reasonably found that, based on the best available current biomass data, application of the management framework in the FMP will likely avoid "overfishing" of anchovy within the meaning of the Act and implementing regulations.  The Court should uphold the Rule and the Rule's application of the framework of the FMP as a reasonable exercise of the agency's expertise based on the evidence before it.

**ARGUMENT**

I.     **NMFS Reasonably Found That "Overfishing" Was Not Likely Under the Rule**

Plaintiff does not dispute that "overfishing" of anchovy is not currently occurring, but argues on reply that if the stock dips in the future to the levels calculated by MacCall/Thayer for 2009-15, "overfishing" will occur.  ECF No. 71 ("Pl. Reply") at 7-10.  Based on the 75% reduction to the overfishing limit, Plaintiff appears to acknowledge that there is no significant risk of "overfishing" when the stock's biomass is above 98,629 MT, but now claims overfishing will immediately occur whenever biomass goes below that threshold for even a single year and apparently by even a single metric ton.  Pl. Reply at 1, 3, 7, 10, 12.  Contrary to Plaintiff's argument, Defendants did not "concede" that overfishing will occur in that circumstance.  *Id.*  As Defendants argued in their brief, NMFS found the exact opposite and expressly found in the Rule that "overfishing" was not likely even if the stock declined in the future to the levels found by MacCall/Thayer for 2009-15, and that finding is supported by the record evidence and entitled to deference by this Court.  Fed. Br. at 2, 15-16 (citing AR 264:16390-16391).[1]

As an initial matter, NMFS reasonably found that the MacCall/Thayer biomass estimates were not accurate measures of absolute or total biomass.  As NMFS explained in the Rule:

> NMFS and other outside scientists had concerns regarding the method used to expand the trend information into estimates of absolute or total abundance.  Also, NMFS and outside scientists identified inherent issues with using data from only the California Cooperative Fisheries Investigation [("CalCOFI")] core region for estimating total biomass, as the spatial scale of this region does not encompass the range of central anchovy, as well as the high uncertainty in the estimates the paper produced.  In 2016, NMFS fishery scientists and other outside scientists highlighted technical flaws in the method the MacCall paper used to derive population estimates in presentations to the Council . . . The Council's Science and Statistical Committee [("SSC")] agreed with NMFS's analysis of these technical weaknesses with the methods

---

[1] Plaintiff is incorrect that Defendants engaged in post hoc rationalization in pointing to the 98,629 MT value in their brief when that value is not explicitly identified in the Rule.  Pl. Reply at 12-13._ In the Rule, NMFS relied in part on the 75% reduction to the overfishing limit in concluding that the new catch limit was likely to avoid overfishing. AR 264: 16390.  The 98,629 MT value merely mathematically illustrates the way that buffer helps avoid overfishing.  But contrary to Plaintiff's argument, Defendants never said that buffer is the only reason the Rule avoids overfishing or that "overfishing" immediately occurs whenever the stock's biomass goes below that level by any amount or for any limited period.

used to derive the biomass estimates in the MacCall and subsequent Thayer papers.

AR 264: 16388.  One critical problem was that MacCall/Thayer used an improper method to scale egg and larval indices, which is specific to their methodology.  AR 411: 19248 ("Scaling egg and larval indices to biomass estimates using [daily egg production method ("DEPM")] estimates from the 1980s appears unjustified and does not produce credible [biomass] estimates"); *see also* AR 412: 19272.

Thus, even if Plaintiff is correct that MacCall/Thayer's low 2009-14 biomass estimates did not require revision like their previously vastly understated 2015 estimate (and incorrect prediction of a similarly low 2016 biomass), *see* Fed. Br. at 11 and Pl. Reply at 9, the methodological issues found by NMFS and Council scientists for the MacCall/Thayer estimates remain.  Nor is the Council SSC's finding that MacCall/Thayer provided useful "trend" data helpful to Plaintiff's argument, as it claims.  Pl. Reply at 10-11.  Under Plaintiff's theory of "overfishing," the question is not the trend (whether the stock is increasing or decreasing) but the absolute biomass, and MacCall/Thayer admitted the low estimates relied upon by Plaintiff in this case are "imprecise" and potentially off by a factor of five or more.  Fed. Br. at 11.  Besides MacCall/Thayer, the only other estimate substantially below 100,000 MT in the record is the plainly understated 2015 acoustic trawl method ("ATM") estimate, which was a first-time effort, never finalized, and had a much smaller survey area.  *See* Fed. Br. at 11-12; Supp. AR 40: 20826 (noting the 77% increase in survey tracklines between the 2015 and 2016 ATM surveys).  In short, Plaintiff relies on biomass values that NMFS and Council scientists have found are not accurate or reliable as measures of the absolute or total biomass of the stock.

More importantly, Plaintiff entirely ignores that NMFS expressly found in the Rule that even if the stock had declined during 2009-15 to the unusually low levels calculated by MacCall/Thayer and did so again, the available recent biomass data for this stock show there likely would be no jeopardy to the capacity of the stock to produce biomass levels that would support harvest at maximum sustainable yield over the long term, i.e., no "overfishing" within the meaning of the Act.  16 U.S.C. § 1802(34); Fed. Br. at 2, 15-16 (citing AR 264:16390-16391).  Specifically, in the Rule, NMFS pointed to the fact that fishing continued at historical

REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Oceana, Inc.  v. Wilbur Ross et al.*, Case No. 5:19-cv-03809-LHK

3

levels under the higher prior catch limit of 25,000 MT through that whole period – with biomass allegedly well under 98,629 MT – and "the stock recovered very substantially in the immediately following years according to all of the available biomass estimates."  AR 264: 16390-16391. Based on this recent data, NMFS found that there is no evidence that fishing under the new, lower catch limit of the Rule will jeopardize the ability of the stock to similarly recover from any unusually low biomass in the future and be harvested at the maximum sustainable yield on average over time.  *Id.* ("the available data and information for this stock does not indicate that fishing at similar levels seen over the last 20 years jeopardizes the long-term productive capacity of the stock, even when biomass levels are relatively low").  In its reply brief, Plaintiff ignores this express finding and the recent biomass data cited by the agency supporting it.

By failing to engage, let alone rebut, part of the agency's explanation in the Rule that directly contradicts Plaintiff's whole theory of "overfishing," Plaintiff fails to carry its burden of proof in this case.  Plaintiff asserts that NMFS has the burden of showing that the Rule will avoid overfishing.  Pl. Reply at 7, 21.  To the contrary, while NMFS had an obligation to provide an explanation for its finding that "overfishing" is not likely, NMFS did that here.  In doing so, NMFS cited probative record evidence – the recovery of the stock from the low biomass levels claimed by Plaintiff while fishing continued at typical levels – that "a reasonable mind might accept as adequate to support [its] conclusion," which is sufficient under the standard of review. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted).  Further, because an agency's action is presumed to be valid, the challenging party bears the burden of proving that the agency's action is arbitrary and capricious.  *Lands Council v. Vaught*, 198 F. Supp. 2d 1211, 1221 (E.D. Wash. 2002) (citing *Preston v. Heckler*, 734 F.2d 1359, 1372 (9th Cir. 1984)).  Not only does Plaintiff have the burden of proof, there is a higher bar to show that an agency's scientific *prediction* of the future efficacy of management measures – which is necessarily open to some debate – is arbitrary and capricious.  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983) (when agency is making predictions within its area of special expertise, as opposed to simple findings of fact, a reviewing court "must generally be at its most deferential").  Thus, Plaintiff must show there is such a clear and

REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT
*Oceana, Inc.  v. Wilbur Ross et al.*, Case No. 5:19-cv-03809-LHK

4

indisputable likelihood of overfishing occurring in the future that NMFS' contrary prediction is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). *See also Flaherty v. Pritzker*, 195 F. Supp. 3d 136, 149 (D.D.C. 2016) (putting the burden on plaintiffs and finding they "failed to substantiate their allegations" that the challenged measures "will not prevent overfishing") (D.D.C. 2016). Plaintiff does not meet this burden.

Overfishing occurs when harvest "jeopardizes the capacity of a fishery to produce the maximum sustainable yield [or fishing harvest] on a continuing basis." 16 U.S.C. § 1802(34). "Maximum sustainable yield" (or MSY) is defined as "the largest *long-term average* catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics . . . and the distribution of catch among fleets." 50 C.F.R. § 600.310(e)(1)(i)(A) (emphasis added). Thus, "overfishing" occurs when harvest jeopardizes the capacity or ability of the stock to be harvested at the maximum sustainable level *on average over the long term*. Further, as discussed above, the National Standard 1 guidelines only require a 50% probability that measures will avoid overfishing. As stated in Defendants' opening brief, Fed. Br. at 15, Plaintiff makes no showing and cites no record evidence that there is more than a 50% likelihood that the stock will decline to a degree and for a sufficient period of time, that harvest under the new catch limit would jeopardize harvest at the maximum sustainable yield on average over the long term. Plaintiff certainly has not explained how "overfishing" necessarily occurs the minute biomass goes any amount below 98,629 MT for a single year or a few years. The recent biomass data for the stock directly refutes that contention, assuming the stock's biomass even went below that level.

Nor is Plaintiff correct that "overfishing" occurs whenever the harvest rate in a single year exceeds the "maximum fishing mortality threshold," or MFMT, which Plaintiff equates with the 23.9% rate used to calculate the catch limit. Pl. Reply at 15-16. NMFS' regulatory guidelines for National Standard 1 identify three alternative methods of identifying "overfishing," only one of which relies on MFMT, and those guidelines do not require any particular method. 50 C.F.R. § 600.310(e)(2)(ii)(A)(1)-(3). NMFS has not relied on MFMT for

anchovy and instead based the catch limit on an acceptable biological catch, or ABC, that has been reduced by 75% from the overfishing limit, or OFL, in part to address changes in the biomass of the stock, which is one of the methods permitted by the guidelines.  *Id*. § 600.310(e)(2)(ii)(A)(2); *see also id*. at § 600.310(f)(3) ("While the ABC is allowed to equal OFL, . . . in most cases ABC will be reduced from OFL to reduce the probability that overfishing might occur.").  Because NMFS used an appropriate method to avoid "overfishing" identified by the guidelines, MFMT does not apply in this case.[2]  Plaintiff also makes no showing that exceeding the harvest rate used to calculate the catch in a limited period results in "overfishing" for the small anchovy fishery, where average harvest over time is a small fraction of biomass and will never get close to long-term average MSY.  *See* Fed. Br. at 14.  At bottom, Plaintiff asks the Court to just assume future jeopardy to the stock's ability to be harvested at MSY – in the face of recent biomass data cited by the agency that contradicts, or, at minimum, casts massive doubt on that unsupported assumption.

The National Standard 1 guidelines also recognize that higher harvest in one year does not necessarily result in overfishing.  Those guidelines provide for a multi-year approach in assessing past overfishing in recognition that "[s]mall amounts of excess effort or catch in a single year may not jeopardize a stocks' ability to produce MSY over the long term."  81 Fed. Reg. 71,858, 71,859 (Oct. 18, 2016); 50 C.F.R. § 600.310(e)(2)(ii)(A)(3).  In adopting the National Standard 1 guidelines, NMFS also found that "the focus is on producing MSY in the long-term," and while "there may be short-term, environmental changes" they "do not normally jeopardize the ability of a stock to produce MSY on a continuing basis."  81 Fed. Reg. at 71,869. NMFS stated, "[f]or example, El Niño increases mortalities and reduces growth within certain stocks, but after the short El Niño period ends, stocks should regain their health and ability to produce MSY on a continuing basis."  *Id*.  Similarly here, atypical changes in environmental conditions (abnormally high temperatures known as the "Blob" and early El Niño effects)

---

[2] Plaintiff asserts that despite the fact that NMFS "has not specified a MFMT for anchovy . . . [Defendants'] brief argues the [23.9% rate] applies on an annual basis, making it equivalent to MFMT."  Pl. Reply at 16.  Contrary to this claim, Defendants never argued that the 23.9% rate can be applied to current biomass annually to identify overfishing.  *See*, e.g., Fed. Br. at 10 (describing 23.9% as "the long-term average harvest rate at maximum sustainable yield").

potentially were limiting the stock, but fishing continued at historical levels and the stock dramatically increased in the immediately following years once those conditions abated.  AR 402: 19218, 19221-22; Supp. AR 1 19573-74.  These conditions also may have caused the stock to temporarily shift out of the CalCOFI core survey area for anchovy eggs and larvae used for estimating biomass by MacCall/Thayer, which potentially explains the atypically low biomass they calculated for 2009-15.  AR 402: 19218, 19221-22.  But regardless of the reason, as NMFS found in adopting the guidelines, a decline in biomass in a given year due to temporary environmental factors while fishing continues does not mean that the ability of the stock to be harvested at the MSY on average over time is being jeopardized, i.e., there is "overfishing."

Indeed, there is simply no evidence in the record of this case that fishing under the new catch limit likely will jeopardize the ability of the stock to recover from any unusually low biomass in the future.  All of the evidence for this stock is to the contrary.  Plaintiff argues that, according to MacCall/Thayer, the biomass of the stock also was below 100,000 MT during 1951-56, 1990, and 1998.  Pl. Reply at 7.  But even assuming the MacCall/Thayer estimates are correct notwithstanding the flaws identified by NMFS and Council scientists, harvest continued during 1951-56, 1990, and 1998 at levels comparable to or higher than in recent years and the stock recovered in the immediately following years.  AR 315: 17427.  In fact, the record contains a graph of the stock's biomass compared to harvest from the 1950s through 2017, including values from MacCall/Thayer, and there is no apparent connection between harvest levels under 25,000 MT and changes in biomass over time.  AR 315: 17427.  Given these facts, scientists including MacCall/Thayer are in agreement that fishing in recent decades is not driving the biomass of this stock.  AR 417: 19377 (MacCall/Thayer stating that the recent decline "occurred in the near absence of fishing and therefore must be considered a natural phenomena") AR 348: 17976 ("it is well documented that forage fish populations collapse repeatedly and these collapses are a common feature of sardine and anchovy population dynamics, even in the absence of commercial fishing," citing multiple studies).  Independent scientists in the agency's Southwest Fisheries Science Center ("Center") that are very familiar with the data also reviewed the

management measures in the Rule and found that they would likely avoid overfishing, which is record evidence that supports NMFS' determination.  Fed. Br. at 16 (citing AR 275:16432).[3]

Plaintiff cites no other record evidence specific to this stock.  Rather, in speculating that fishing "could exacerbate natural declines," Plaintiff relies on more generic papers older than the recent anchovy biomass data cited by the agency.  These studies: (1) are not about anchovy (let alone the specific stock here); (2) involve stocks subject to a much higher level of harvest than anchovy; or (3) only discuss that the biomass of certain stocks like anchovy can vary and decline but do not specifically concern the impact of fishing.  Pl. Reply at 8 (citing Essington study at AR 282: 16523, 16525 of stocks with much higher, over 60% annual harvest rates[4]); *id.* at 28 (quoting a statement from AR 348:17976 that cites this same Essington paper); *id.* at 8, 20 (citing study of fishery collapses at AR 282: 16578, 16579 that expressly *excluded* "small pelagics (families Clupeidae and Engraulidae)," such as anchovy, "since these species are known to fluctuate strongly"); *id.* at 20 (citing study at AR 282: 16587, 16589-90 identifying several other species such as flounder, mackerel, and herring, but containing no discussion of anchovy); *id.* at 8 (citing 2016 AR 50:1230-31 for proposition that anchovy and other stocks can decline due to "ocean conditions").[5]  Plaintiff also fails to overcome a more pertinent study by the Council's SSC showing that the probability of a stock being "overfished" substantially falls as the buffer between OFL (based on MSY) and ABC increases (and here OFL was reduced by 75% to calculate ABC).  AR 310:17409.  Plaintiff complains that this study made various assumptions

---

[3] Plaintiff suggests the Court should place little value on the Center's expert opinion because it was memorialized in a document that did not duplicate all of the agency's analysis and explanation.  Pl. Reply at 22.  The Center did not need to do so since, as Plaintiff concedes, the Center reviewed the proposed Rule containing the agency's basis and explanation for the Rule. *Id.*  *See also* AR 272: 17773-17786 (transmitting proposed rule to the Center).

[4] As explained in Defendants' opening brief, the anchovy fishery experiences much lower harvest rates on average and even in individual years when biomass is relatively low.  Fed. Br. at 14, 17.  Plaintiff offers no rebuttal to this point and just continues to cite this inapposite paper.

[5] Plaintiff also tries to rely on the decline of the Pacific sardine fishery, which prior to closure was a vastly larger and more active commercial fishery than anchovy.  Pl. Reply at 19 n.6.  Harvest for that stock was between about 50,000 and 130,000 MT per year, while its biomass ranged at levels not much larger than for anchovy in many years.  Second Supp. AR 53: 21247, 21253, 21279.  In fact, the title of one of Plaintiff's cited papers describes the sardine stock as subject to "high exploitation rates."  Pl. Reply at 19 n.6.  By comparison, the anchovy stock is barely fished, with harvest averaging only 7,020 MT per year during 2009-18.  Fed. Br. at 7.

and used a "simulated" population, but that is true of any study of this kind.  Pl. Reply at 21.

Plaintiff offers no reason for the Court to doubt the paper's showing that less frequent

adjustments to OFL protect against overfishing where ABC reflects a large reduction from OFL,

as here.  AR 310:17409.

Plaintiff also incorrectly suggests that OFL must be adjusted annually under the

guidelines.  Pl. Reply at 16-17.  OFL is normally based on MSY, which as discussed above, is

expressly defined as a "*long-term average* catch or yield." 50 C.F.R. § 600.310(e)(1)(i)(A)

(emphasis added); AR 262: 16390 ("MSY is a long-term average yield . . . and is intended to

represent the amount of fishing mortality that may sustainably occur over the long term, even

with variability in stock biomass").  Plaintiff identifies no express requirement in the Act or

implementing regulations that requires an annual adjustment to OFL.  Nor does Plaintiff identify

any case law in support of this argument.  Many fisheries are managed without an annual

adjustment to OFL or other management measures.  *See*, e.g., *Massachusetts v. Pritzker*, 10 F.

Supp. 3d 208, 214 (D. Mass. 2014) (referring to multi-year OFLs).  There are multiple ways for

an agency to comply with a legal requirement, and Plaintiff has not shown that the Rule is likely

to lead to overfishing in the future for anchovy.  This Court should reject Plaintiff's invitation to

impose a requirement based on "its own notion of which procedures are 'best' or most likely to

further some vague, undefined public good."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.

Council*, 435 U.S. 519, 549 (1978).

In sum, Plaintiff is asking this Court to sift among various scraps of competing, less

probative evidence and adopt Plaintiff's own view of the risk of overfishing and how to manage

the stock that is not shared by the expert agency and its scientists, despite the fact that the agency

fully explained its determination and cited recent evidence specific to this stock that a reasonable

mind might accept to support the agency's conclusion.  Doing so would be inconsistent with the

standard of review.  *Jewell*, 747 F.3d at 601; *Innova Sols. v. Baran*, 399 F. Supp. 3d 1004, 1011

(N.D. Cal. 2019) (citation omitted).

## II.     Plaintiff Is Not Entitled To A Presumption That NMFS Will Not Fulfill Its Obligations Under the Magnuson Act

In other respects, Plaintiff's reply seriously misstates Defendants' arguments. Defendants never suggested that NMFS had no obligation to avoid overfishing and could always address it after-the-fact.  Pl. Reply at 22-24.  Defendants instead pointed out that – as Plaintiff does not dispute – the Act and guidelines do not require overly conservative management measures in an effort to prevent overfishing under any possible set of circumstances.  Rather, the Act and guidelines require only a 50% likelihood that the catch limit will avoid overfishing.  Fed. Br. at 14-15.  In this context, Defendants argued that "while [NMFS] did not believe that 'overfishing' is likely for this stock," if any "*unexpected*" overfishing occurred in the future despite the reasonable contrary prediction of the agency, then NMFS must (and has stated that it will) take action to address that overfishing.  Fed. Br. at 18-19, 22 (emphasis added); AR 264: 16391.  This argument is fully consistent with the Act and its recognition that some risk of overfishing always exists if productive fishing effort occurs consistent with the Act's goals. Plaintiff's mischaracterization of Defendants' position is yet another example of its over-the-top effort to portray everything the agency does or says as in bad faith.[6]

Plaintiff also falsely implies that Defendants "offered no reason" for the Court to believe that the agency will take any necessary appropriate action in the future if unusual conditions warrant management changes.  Pl. Reply at 24, 34.  To the contrary, as Defendants pointed out and NMFS stated in the Rule, agency scientists now are generating reliable current biomass estimates for anchovy, and NMFS has stated it will use those estimates to monitor the stock's condition and determine whether any management changes are necessary "if NMFS were to observe any anomalously low fluctuations in the population."  AR 264: 16391.  Plaintiff insists the agency had low estimates from MacCall/Thayer before, and thus the Court should conclude

---

[6] As another example, Plaintiff seizes on some inconsistent language in Defendants' brief regarding the period for ending overfishing. Pl. Reply at 23 n.9.  But Defendants acknowledged that the Act requires that if, within one year of the identification of "overfishing" in a fishery, "the Council does not submit to the Secretary a fishery management plan, plan amendment, or proposed regulations" to "*end overfishing immediately in the fishery* and to rebuild affected stocks," NMFS "shall prepare a fishery management plan or plan amendment and any accompanying regulations to stop overfishing and rebuild affected stocks of fish." Fed. Br. at 17-18 (citing 16 U.S.C. § 1854(e)(3), (5)) (emphasis added)).

the agency will not take action in the future.  Pl. Reply at 24.  This argument ignores that NMFS

and Council scientists found numerous methodological flaws with the MacCall/Thayer estimates,

but that is not the case for the agency's own current ATM and DEPM estimates.  Plaintiff also

incorrectly suggests that NMFS would reject any low biomass estimates from "independent"

sources because its purported "primary rationale to date for rejecting low anchovy abundance

estimates is that the estimates are imprecise due to uncertainty in the survey data."  Pl. Reply at

24.  First, that caveated argument does not even address the agency's own ATM and DEPM

estimates.  Plaintiff does not offer any reason that NMFS would refuse to take action if its own

current biomass estimates warranted changes to anchovy management.  Second, Plaintiff has not

established that NMFS will reject any future "independent" biomass estimates.  NMFS and

Council scientists had multiple reasons for discounting the MacCall/Thayer estimates, including

reasons that were specific to the 2009-14 period (the apparent shift of the stock outside of the

CalCOFI survey range due to the unusual environmental conditions).  And while

MacCall/Thayer identified their low estimates as "imprecise," Plaintiff has not established that

would be true for every future low estimate.  Future ATM estimates also likely will be less

affected by survey limitations, since scientists are working on adjustments to address this issue.

Fed. Br. at 5.  Plaintiff cannot prejudge now how NMFS will evaluate future biomass data.

   More fundamentally, assuming that NMFS will not fairly consider new data or take

appropriate action in the future for this stock as required by the Magnuson Act would be contrary

to the presumption of regularity afforded agencies under the law.  *Red Top Mercury Mines v.*

*United States*, 887 F.2d 198, 202–03 (9th Cir. 1989) ("There is a presumption of regularity in the

performance of their duties by government officials.") (citations omitted).  *Nw. Envtl. Def. Ctr. v.*

*U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1307 (D. Or. 2011) (agency commitment to

monitor take of species entitled to presumption of regularity).  Plaintiff is not entitled to the

opposite assumption that NMFS will not take any appropriate action for this stock.  NMFS

properly established a catch limit that is likely to avoid overfishing based on the current record,

but if new or anomalous conditions with the stock warrant management changes in the future, the

agency lawfully may and will take action at that time as stated in the Rule.

1

2

**III.    NMFS Relied On the Best Available Data for Setting the Catch Limit**

3         Defendants rest on their opening brief establishing that NMFS relied on the best available

4  recent biomass data to calculate the catch limit consistent with the Court's prior ruling, Fed. Br.

5  at 9-13, and make only one further point on this issue.  Again mischaracterizing Defendants'

6  arguments, Plaintiff asserts that "NMFS *admits* that it chose the data it did precisely because it

7  matched their pre-determined, status quo figures, not because it reflected the best available

8  science on anchovy abundance in recent years."  Pl. Reply at 36.  Contrary to this argument,

9  NMFS used every recent biomass value for the new catch limit except those that it expressly

10 found was affected by one or more flaws or limitations and thus was not the best information

11 available.  AR 264: 16388-89; *see also* Fed. Br. at 5-6.  Plaintiff does not identify *any* post-1994

12 biomass value that NMFS omitted without explaining why it was not the best information

13 available.  Plaintiff instead seizes on the fact that Defendants' brief noted that NMFS also

14 compared the average biomass resulting from the three selected biomass values (from 2016-18)

15 to the stock's long-term average and median biomass.  Fed. Br. at 5, 10, 12.  The fact that the

16 agency made this comparison and that Defendants' brief states at one point that NMFS offered it

17 "in part" as support for the Rule does not mean that NMFS selected the three values for that

18 reason.  *Id*.  The Rule speaks for itself, and NMFS found that all rejected values were not the best

19 information available for valid reasons.  AR 264: 16388-89.  Nor was it improper for NMFS to

20 make this comparison to confirm that the average of the selected recent values was "well within

21 the range of historic estimates" and consistent with long-term average biomass.  AR 264: 16388.

22 **IV.    NMFS Plainly Considered Predator Consumption, and Nothing More Is
          Required by the Act**

23         With respect to "optimum yield," as explained in Defendants' opening brief, the Act and

24 National Standard 1 guidelines only require NMFS to consider ecological factors such as

25 predator consumption.  Fed. Br. at 19-20.  Plaintiff's reply practically admits as much.  Pl. Reply

26 at 25 (statute only requires "taking into account" protection of marine ecosystems); *id*. at 26

27 (citing cases for proposition that NMFS has "*discretion* to reduce fishing effort based on

28 conservation-oriented optimum yield considerations.") (emphasis added); *id*. at n. 11 (not

seriously disputing that NMFS is not required to draw the balance in favor of predators over

harvest, but could choose to do so).  Plaintiff's brief also contains multiple statements from NMFS' guidelines confirming that NMFS need only consider the various factors affecting optimum yield.  *See*, e.g., Pl. Reply at 25 (50 C.F.R. § 600.310(e)(3)(iii)(A) identifies factors that should "receive serious attention"); *id*. at 27 (50 C.F.R. § 600.310(e)(3)(iii)(B)(3) states that species interactions "should be considered.").  Contrary to Plaintiff's argument, NMFS expressly discussed and did not "ignore" predator consumption.  Pl. Reply at 27; Fed. Br. at 20-21 (citing AR 264:16390-16391); Supp. AR 1:19574.  The administrative record also reflects consideration of evidence on this factor.  *See*, *e.g.*, AR 348; Supp. AR 37; Supp. AR 15: 19978-79; AR 408; 2016 AR 34: 973-79; 2016 AR 1, 3, 4, 8, 9, 32, 144, 156, 199, 208, 222, 223, and 226-29.

Plaintiff also ignores two other critical points on reply.  First, even if the statute required NMFS to reduce catch to leave more anchovy for predators, NMFS found it has already done so with the 75% reduction to OFL.  Fed. Br. at 20-21 (citing AR 264:16390-16391).  Second, Plaintiff ignores that "[t]he statutory 'optimum yield' definition recognizes that optimum yield is a standard that should be achieved over the long-run, not necessarily a standard that must be achieved with precision each year."  *Nat'l Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 135 (D.D.C. 2002); 50 C.F.R. § 600.310(f)(1)(ii) (2002) ("[i]n national standard 1, ... 'achieving, on a continuing basis, the [optimum yield] from each fishery' means producing, from each fishery, a long-term series of catches such that the *average* catch is equal to the *average* [optimum yield]") (emphasis added).  Because of the OFL reduction, only about 6% of the stock on average is allowed to be harvested over time, with the balance available for ecosystem needs.  Fed. Br. at 14.  Plaintiff's desire that NMFS further reduce or zero-out the fishery "in some years" is inconsistent with the long-term nature of "optimum yield."  Pl. Reply at 26 n.11.

## V.  Even If The Court Reaches Plaintiff's Untimely Challenge to the FMP, Plaintiff Has Not Shown the Challenged Provisions Are Unlawful

Federal Defendants largely rest on the arguments in their opening brief showing that Plaintiff's challenge to the FMP provisions (1) is untimely under the plain language of the Act and (2) improperly relies on evidence that post-dates the challenged FMP provisions.  Fed. Br. at 21-23.  Even if Plaintiff is correct that it can challenge the regulations implementing the FMP, Pl. Reply at 31-32, that would at most permit the Court to review (and if it finds an error, remand

and/or vacate) only the regulations, not the FMP.  As to Plaintiff's admitted reliance on evidence that post-dates the FMP provisions, Plaintiff cites no case for its argument that bedrock Administrative Procedure Act ("APA") review principles – such as the prohibition on using post-decisional information to invalidate agency action – somehow do not apply to agency decisions under the Magnuson Act.  Fed. Br. at 22-23; Pl. Reply at 33 n.14.  The Act incorporates the APA standard of review and thus all case law applying that standard.  16 U.S.C. § 1855(f)(1).

If the Court nevertheless reaches Plaintiff's challenge to the FMP provisions, for all of the reasons set forth above and in Defendants' opening brief, the Court should reject Plaintiff's argument that the management framework of the FMP for anchovy violates the Act.  Applying the best available current biomass data and under that framework, NMFS issued a Rule that fully complies with the Act and will avoid "overfishing."  But even assuming the Court were to find that the Rule is unlawful, Plaintiff fails to show that a new Rule could not be issued under the existing FMP framework that would be lawful.  As Defendants noted in their opening brief, Plaintiff took the opposite position in its comments on the proposed rule, arguing that NMFS could have taken another approach under the existing FMP.  AR 282:16469-16470.  Plaintiff complains that NMFS responded in the Rule that the FMP did not allow its proposal that NMFS "adjust anchovy catch limits annually."  Pl. Reply at 34.  But Plaintiff's comments recognized that issue (calling on NMFS to "instruct the Council to expedite changes to the [FMP]") and thus outlined an alternative that did not require annual adjustments.  AR 282:16469-16470.  While calling it a "shorter term" option, Plaintiff described this alternative as meeting the obligation "to avoid overfishing" and explained how "NMFS could do this."  *Id.*  In any event, if the Court finds the Rule unlawful, NMFS should be permitted to explore alternative methodologies within the existing FMP framework.  The FMP contains significant flexibility.  Fed. Br. at 23-24.  Plaintiff's myopic focus on mandated annual adjustment – for unusually low biomass levels that occur rarely if at all – does not mean there are no other ways to comply with the Act under the existing FMP.  The Court also could find an error in the Rule – such as a failure to fully explain a finding or improper selection of biomass values – that would not automatically require a finding

the FMP is unlawful.  In short, a finding that the Rule is unlawful does not immediately translate to a conclusion that the longstanding FMP framework for anchovy violates the Act.

## VI.   Plaintiff Seeks an Unlawful Remedy That Would Dictate The Substance of Agency Action on Remand

While the Court should rule for Defendants, Plaintiff does not provide any legal basis for the remedy it seeks that would dictate the substance of agency action on remand.  On reply, Plaintiff cites *Alaska Center for the Environment v. Reilly*, 796 F. Supp. 1374, 1379–81 (W.D. Wash. 1992).  Pl. Reply at 38-39.  There, the court established only a schedule for the agency to take required action and to provide status reports, and required water quality monitoring while reserving "what, if any . . . monitoring would be both appropriate and practicable . . . to the Agency's discretion."  796 F. Supp. at 380.  In affirming, the Ninth Circuit noted that, "[w]hile issuing these general directives to ensure ultimate compliance with the [Clean Water Act], the court was careful to leave the substance and manner of achieving that compliance entirely to the [agency]." *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986-87 (9th Cir. 1994).  Plaintiff also cites *National Wildlife Federation v. NMFS*, 524 F.3d 917, 937 (9th Cir. 2008), which upheld a state and tribal collaboration requirement that "does not on its face direct the substance of the agencies' actions on remand, and may not be interpreted to do so."  Plaintiff's claim that its proposed remedy would not impinge on agency discretion on remand falls flat.  Pl. Reply at 40.  Among other things, Plaintiff demands that the Court require "annual specifications" using "annually updated" biomass estimates – when its own comments on the proposed rule identified another means for complying with the Act.  *See* Fed. Br. at 24-5.  If the Court rules for Plaintiff, the Court should allow for additional briefing since the extent and nature of any errors found by the Court may affect the appropriate remedy.  Defendants cannot fully brief that issue now.

## CONCLUSION

Based on the record evidence supporting the agency's decision, NMFS reasonably found that the Rule would avoid overfishing and otherwise complies with the Act.  Plaintiff has not identified a sufficient legal basis or any record evidence for the Court to depart from deference to the agency's determination.  The Court should also reject Plaintiff's challenge to the FMP.

Dated: June 11, 2020

JEAN E. WILLIAMS
Deputy Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

*/s/ Clifford E. Stevens, Jr.*
CLIFFORD E. STEVENS, JR.
Senior Trial Attorney, DC Bar Number 463906
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 353-0368
Facsimile: (202) 305-0275
Email: clifford.stevens@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

    I hereby certify that, this 11th day of June, 2020, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF system, which will send notification of such to the attorneys of record.


                    */s/ Clifford E. Stevens, Jr.*

                    CLIFFORD E. STEVENS, JR.