1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10                SAN JOSE DIVISION

11

12   OCEANA, INC.,                          Case No. 19-CV-03809-LHK

13              Plaintiff,                   **ORDER REGARDING MOTIONS FOR
                                             SUMMARY JUDGMENT**
14        v.
                                             Re: Dkt. Nos. 59, 63, 64
15   WILBUR L. ROSS, et al.,

16              Defendants.

17

18        Plaintiff Oceana, Inc. ("Plaintiff") brings this action against Defendant Wilbur Ross, in his

19   official capacity; Defendant National Oceanic and Atmospheric Administration ("NOAA"); and

20   Defendant National Marine Fisheries Service ("NMFS") (collectively, "Government

21   Defendants").  On August 23, 2019, the Court granted California Wetfish Producers Association

22   and Monterey Fish Company Inc.'s ("Intervenor-Defendants") unopposed motion to intervene.

23   ECF No. 27.

24        Before the Court are Plaintiff's motion for summary judgment, Intervenor-Defendants

25   cross-motion for summary judgment, and Government Defendants' cross-motion for summary

26   judgment.  ECF Nos. 59, 63, and 64.  Having considered the parties' submissions, the relevant

27   law, and the record in this case, the Court GRANTS in part and DENIES in part Plaintiff's motion

28
                                               1

United States District Court
Northern District of California

1  for summary judgment and Intervenor-Defendants' and Government Defendants' cross-motions

2  for summary judgment.

3  **I.      BACKGROUND**

4      **A.  Statutory and Regulatory Background**

5        **1.  Magnuson-Stevens Fishery Conservation and Management Act**

6        In response to overfishing concerns, Congress enacted the Magnuson-Stevens Fishery

7  Conservation and Management Act of 1976 ("Magnuson-Stevens Act" or "MSA") to promote the

8  long-term biological and economic sustainability of marine fisheries in U.S. federal waters.  *See*

9  16 U.S.C. § 1801(a)–(b).  The Magnuson-Stevens Act created eight Regional Fishery

10  Management Councils and requires the Councils to create fishery management plans ("FMPs")

11  aimed at preventing overfishing, along with any amendments to the FMPs.  *Id.* §§ 1852(h)(1),

12  1801(b)(4), 1854(a)(3).

13        Councils submit FMPs and amendments to the Secretary of Commerce ("Secretary"), who

14  reviews them to determine whether they are consistent with the Magnuson-Stevens Act and other

15  applicable law.  *Id.* §§ 1851(a), 1854(a)(1)(A).  The Secretary must publish notice of a Council's

16  proposed FMP or amendment in the Federal Register and solicit public comment.  *Id.*

17  §§ 1854(a)(1)(B), 1854(a)(5).  Within 30 days of the close of the public comment period, the

18  Secretary must either "approve, disapprove, or partially approve [the FMP] or amendment . . . by

19  written notice to the Council."  *Id.* § 1854(a)(3).  If the Secretary does not notify the Council of

20  the Secretary's decision, the FMP or amendment takes effect as if approved.  *Id.*

21        FMPs and amendments "do not themselves have any regulatory effect—implementing

22  regulations must also be enacted in order to effectuate them."  *N. Carolina Fisheries Ass'n, Inc. v.*

23  *Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008).  The Magnuson-Stevens Act therefore requires

24  Councils to submit proposed regulations implementing an FMP or amendment to the Secretary for

25  approval. 16 U.S.C. § 1853(c)(1).  The Secretary evaluates whether the proposed regulations are

26  consistent with the FMP, amendment, the Magnuson-Stevens Act, and any other applicable law.

27  *Id.* § 1854(b)(1).  If the Secretary determines the proposed regulations are consistent, the Secretary

28  

2

must "publish such regulations in the Federal Register . . . for a public comment period of 15 to 60 days." *Id.* § 1854(a)(1)(A)).  The Secretary then "promulgate[s] final regulations within 30 days after the end of the comment period." *Id.* § 1854(b)(3).  In practice, the NMFS carries out the Secretary's duty to review FMPs, amendments, and regulations because the Secretary has delegated his responsibilities under the Magnuson-Stevens Act to the NMFS.  *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1170 (9th Cir. 2016).[1]

Chief among the Magnuson-Stevens Act requirements that FMPs, amendments, and regulations must satisfy are the Magnuson-Stevens Act's ten "national standards for fishery conservation and management." 16 U.S.C. § 1851(a) (setting out the ten National Standards). This action centers on National Standard One and National Standard Two. *Id.* §§ 1851(a)(1) (National Standard One), 1851(a)(2) (National Standard Two).

National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).  The term "overfishing" means "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34).  Maximum sustainable yield ("MSY") is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics." 50 C.F.R. § 600.310(e)(1)(i)(A).  Thus, overfishing is "a rate of fishing which would jeopardize the capacity of a fishery to produce the [MSY] on a continuing basis." *Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1036 (N.D. Cal. 2013).

"Congress, however, recognized that a certain amount of scientific uncertainty in predicting a stock's overfishing level is inevitable," and as a result, National Standard One guidelines "operate to ensure that there is no greater than a 50% probability that overfishing will occur." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 128 (D.D.C. 2011) (citing 50 C.F.R.

---

[1] The NMFS is a subagency of NOAA, which is part of the Department of Commerce. *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 889 (9th Cir. 2010).

United States District Court
Northern District of California

§ 600.310(f)); *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 213 (D. Mass. 2014) ("The objective of the control rule is to provide a buffer between OFL [overfishing limit] and ABC [acceptable biological catch] such that there is less than a 50% chance that overfishing will occur."); 50 C.F.R. § 600.310(f)(2)(i) (implementing regulations for National Standard One stating that ABC "could be based on an acceptable probability (at least 50 percent) that catch equal to the stock's ABC will not result in overfishing"). Moreover, in adopting the National Standard One guidelines, the NMFS explicitly found that "the focus is on producing MSY in the long-term" and that "[s]mall amounts of excess effort or catch in a single year may not jeopardize a stocks' ability to produce MSY over the long term." 81 Fed. Reg. 71858, 71859 (Oct. 18, 2016).

National Standard Two requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). However, "[t]he fact that scientific information concerning a fishery is incomplete does not prevent [regulation]." 50 C.F.R. § 600.315(b). On the contrary, "by specifying that decisions be based on the best scientific information *available*, the Magnuson-Stevens Act recognizes that such information may not be exact or totally complete." *Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1003 (9th Cir. 2004) (emphasis in original).

**2. Magnuson-Stevens Fishery Conservation and Management Reauthorization Act**

The Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 ("MSRA"), "impose[s] additional requirements for fishery management plans intended to strengthen the role of science and account for uncertainty in fishery management." *Bryson*, 940 F. Supp. 2d at 1037. In relevant part, the MSRA requires that each FMP "establish a mechanism for specifying annual catch limits in the plan . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15). The annual catch limits ("ACLs") "may not exceed the fishing level recommendations of [the Council's] scientific and statistical committee." *Id.* § 1852(h)(6).

ACLs are set with reference to the overfishing limit ("OFL") and the acceptable biological catch ("ABC"). The OFL is a quantifiable factor that is "used to determine if overfishing has

4

1    occurred, or if the stock or stock complex [of a fishery] is overfished."  50 C.F.R.

2    § 600.310(e)(2)(i)(A).  Determining when overfishing has occurred involves a degree of scientific

3    uncertainty, so in the course of setting an OFL, Councils are also instructed to establish an ABC,

4    which is "a level of a stock or stock complex's annual catch that accounts for the scientific

5    uncertainty in the estimate of OFL and any other scientific uncertainty."  *Id.* § 600.310(f)(2)(ii)

6    Because the ABC is the OFL after the OFL has been reduced to account for scientific uncertainty,

7    a fishery's ABC is likely to be lower than the fishery's OFL.  *Bryson*, 940 F. Supp. 2d at 1037; 50

8    C.F.R. § 600.310(f)(3) ("While the ABC is allowed to equal OFL, [the Service] expects that in

9    most cases ABC will be reduced from OFL to reduce the probability that overfishing might occur

10   in a year."); *Locke*, 831 F. Supp. 2d at 128 (ABC must be set "to ensure that there is no greater

11   than a 50% probability that overfishing will occur."); 50 C.F.R. § 600.310(f)(2)(i) (ABC "could be

12   based on an acceptable probability (at least 50 percent) that catch equal to the stock's ABC will

13   not result in overfishing").  In turn, the ACL "is a limit on the total annual catch of a stock or stock

14   complex," which may be equal to but "cannot exceed the ABC."  50 C.F.R. § 600.310(f)(1)(iii);

15   *see also id.* § 600.310(f)(4)(i) ("If a Council recommends an ACL which equals ABC, and the

16   ABC is equal to OFL, the Secretary may presume that the proposal would not prevent overfishing,

17   in the absence of sufficient analysis and justification for the approach.").

18      **B.   Factual Background**

19         **1.   Northern Anchovy**

20         The northern anchovy ("anchovy") is a small fish that is typically found in schools near the

21   ocean's surface.  2016 AR 7:146, 174.  Anchovy are relatively short-lived, and their populations

22   tend to fluctuate significantly over time.  2016 AR 7:294; 2016 AR 29:831.  Anchovy are valuable

23   food sources to a wide variety of predators, including fish, birds, and mammals.  2016 AR 7:146;

24   2016 AR 45:1161 (noting that diet studies of 32 marine predators found anchovy was the most

25   important forage fish in the California Current Ecosystem).

26         **2.   Coastal Pelagic Species Fisheries Management Plan**

27         The Pacific Fishery Management Council ("Pacific Council") is one of the eight Councils

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   created by the Magnuson-Stevens Act.  16 U.S.C. § 1852(a)(1)(F).  The Pacific Council is

2   responsible for Pacific Ocean fisheries off the coasts of California, Oregon, and Washington.  *Id.*

3   The Pacific Council's Coastal Pelagic Species Fishery Management Plan ("CPS FMP") governs

4   Pacific sardine, Pacific mackerel, anchovy, market squid, and krill.  AR 292:13858.[2]  The CPS

5   FMP divides the anchovy into two subpopulations, the northern subpopulation and the central

6   subpopulation.  *Id.*  This suit concerns the central subpopulation, so future references to "anchovy"

7   refer to the central subpopulation unless otherwise noted.

8         Although the CPS FMP dates back to 1978, it has been amended a number of times over

9   the ensuing years.  *Bryson*, 940 F. Supp. 2d at 1038.  Amendment 8 and Amendment 13 are

10  particularly relevant to this case, as is a 2019 action establishing an ACL for the anchovy.

11        Amendment 8 was implemented on January 1, 2000.  2016 AR 30:890.  Amendment 8

12  divided the fish stocks covered by the CPS FMP into two main categories: actively managed

13  stocks and monitored stocks.  2016 AR 30:892.  The "active" category is for "stocks and fisheries

14  with biologically significant levels of catch, or biological or socioeconomic considerations

15  requiring relatively intense harvest management procedures."  2016 AR 30:892–93.  Stocks that

16  do not require intense harvest management procedures, for instance because they are not heavily

17  fished, fall in the "monitored" category.  *Id.*

18        The anchovy is in the monitored category.  2016 AR 7:459. Amendment 8 specified that

19  the MSY for the anchovy was 100,000 mt and that the anchovy's ABC was 25,000 mt.  2016 AR

20  7:459–60.  The anchovy's ABC was set based on a default rule that set ABC as 25 percent of a

21  stock's MSY.  2016 AR 7:459.

22        Amendment 13 was implemented on November 14, 2011.  2016 AR 31:933–35.

23  Amendment 13 was a response to the MSRA's requirement that FMPs incorporate ACLs.  2016

24  AR 31:933; 16 U.S.C. § 1853(a)(15) (requiring FMPs to establish mechanisms for specifying

25  ACLs).  Amendment 13 implemented "a default management framework" for setting ACLs.  81

26

27  [2] "Pelagic" species live in the water column as opposed to near the sea floor, and are generally found between the ocean's surface and 1,000 meters below the surface. AR 29:831.

28  
Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

Fed. Reg. 74309, 74309 (Oct. 26, 2016); AR 264:16388. The default framework set a monitored stock's OFL as equal to the stock's MSY. 84 Fed. Reg. at 74310; 2016 AR 31:933–34. The anchovy's MSY was already set at 100,000 mt, so the anchovy's OFL was likewise set at 100,000 mt. 81 Fed. Reg. at 74310. The default framework also retained the existing formula for setting a monitored stock's ABC, such that "ABC equals 25 percent of OFL/MSY." 2016 AR 31:933. Consequently, the anchovy's ABC remained set at 25,000 mt. 81 Fed. Reg. at 74311. Finally, by default ACLs were set equal to ABC. 2016 AR 30:891.

### 3. The 2016 Catch Rule and *Oceana I*

On November 20, 2015, the Service published a proposed rule in the Federal Register to set an annual catch limit ("ACL") for the anchovy and other stocks managed by the Coastal Pelagic Species Fishery Management Plan ("CPS FMP"). AR 88:1968. In line with Amendment 13, the proposed rule would set the anchovy's ACL equal to the anchovy's 25,000 mt acceptable biological catch ("ABC"). AR 88:1968–69. On October 26, 2016, the Service published a final rule in the Federal Register ("the 2016 Catch Rule") that set the anchovy's ACL at 25,000 mt, equal to the ABC. 81 Fed. Reg. at 74310.

On November 11, 2016, Plaintiff filed a complaint challenging the 2016 Catch Rule ("*Oceana I*"). There were no intervenor defendants in *Oceana I*. The only defendants were government defendants. Plaintiff and Defendants filed cross-motions for summary judgment, and on January 18, 2018, the Court granted Plaintiff's motion for summary judgment and denied Defendants' motion for summary judgment. *Oceana, Inc. v. Ross*, No. 16-CV-06784-LHK, 2018 WL 1989575, at *4 (N.D. Cal. Jan. 18, 2018) ("*Oceana I*").

The Court held that Plaintiff's challenge to the overfishing limit ("OFL") and acceptable biological catch ("ABC") were timely. *Id.* at *6–8. Proceeding to the merits, the Court next concluded that the OFL, ABC, and ACL set by the NMFS were not based on the best scientific information available, in violation of National Standard Two. *Id.* at *9. Specifically, the OFL, ABC, and ACL were "based on a 1991 study by Jon Conrad ('Conrad Study')" and the Conrad Study was based on higher estimates of the anchovy's long-term average biomass. *Id.* at *10.

United States District Court
Northern District of California

1   Importantly, however, the Court concluded that "recent scientific information indicate[d] that the

2   anchovy has collapsed below the levels found by the [Conrad Study], and thus that the Conrad

3   Study's [estimates were] no longer accurate." *Id*. at *11.  The NMFS's unjustified dismissal of the

4   more recent evidence, as well as its continued adherence to the outdated Conrad Study, rendered

5   its actions arbitrary and capricious.  *Id*. at *15.

6          Finally, the Court determined that the OFL, ABC, and ACL set in the 2016 Catch Rule

7   violated National Standard One because the limits did not prevent overfishing.  *Id*. at *15.

8   Because the 2016 Catch Rule adopted Amendment 13's 100,000 mt OFL based on the Conrad

9   Study's outdated estimates, "it was at minimum arbitrary and capricious for [the NMFS] to fail to

10  consider whether the OFL estimate still prevented overfishing in light of its reliance on the Conrad

11  study."  *Id*.  "It followe[d] that it was also arbitrary and capricious for [the NMFS] to fail to

12  consider whether the ABC and ACL could prevent overfishing in light of its reliance on the OFL."

13  *Id*. at *16.  "[I]n other words, [the problem] [was] that the ABC [was] justified solely in terms of

14  the OFL and therefore ignore[d] the crucial variable: anchovy abundance.  Reducing an outdated

15  OFL by a fixed percentage without considering whether the anchovy population might have

16  changed since 1991 ignores the most important aspect of the problem—the size of the anchovy

17  population."  *Id*. (quotation marks omitted).  Accordingly, the Court vacated the anchovy OFL,

18  ABC, and ACL set in the 2016 Catch Rule.

19         On February 15, 2018, Defendants filed a motion to alter or amend the Court's judgment.

20  *Oceana, Inc. v. Ross*, No. 16-CV-06784-LHK, ECF No. 63 (N.D. Cal. Feb. 2018).  Defendants

21  requested clarification that the Court's vacatur only applied to the central population of the

22  northern anchovy.  Defendants also requested that the Court clarify whether it vacated only the

23  ACL set in the 2016 Catch Rule and not the OFL or ABC on which the ACL was based.  Plaintiff

24  opposed the motion on March 1, 2018, *id.*, ECF No. 64, and Government Defendants replied on

25  March 8, 2018, *id.*, ECF No. 66.

26         On June 13, 2018, the Court granted in part and denied in part the motion to alter or amend

27  judgment.  *Id.*, ECF No. 68.  The Court noted that "[t]he parties have only ever litigated the

28

8

reference points set for the central population of the northern anchovy" and that "the Court's 33-page summary judgment order nowhere discusses the other stocks." *Id.* at 2. Therefore, the Court "clarifie[d], if doing so was necessary, that its judgment did not vacate the reference points the Catch Rule set for stocks other than the central population of the northern anchovy." *Id.* As to Defendants' second request, the Court clarified that it "did vacate the OFL and ABC in this case for the central population of the northern anchovy." *Id.*

On August 10, 2018, the Defendants appealed the Court's decision to the Ninth Circuit. *Id.*, ECF Nos. 69, 70.

On September 21, 2018, Plaintiff filed a motion to enforce the judgment. *Id.*, ECF No. 72. Plaintiff noted that more than eight months after the Court issued its January 18, 2018 order granting Plaintiff's motion for summary judgment and denying Defendants' cross-motion for summary judgment, Defendants had still not issued a new catch rule and that commercial catch of anchovy had continued without regulation. *Id.* at 1. Plaintiff requested that the Court direct the NMFS to issue a proposed rule within 90 days after the Court's decision. *Id.* at 1–2. Defendants opposed the motion on October 26, 2018, *id.*, ECF No. 76, and Plaintiff filed a reply on November 9, 2018, *id.*, ECF No. 77.

The Court granted Plaintiff's motion to enforce the judgment on January 18, 2019. *Id.*, ECF No. 79. The Court noted that Plaintiff's summary judgment motion had requested that the Court remand the 2016 Catch Rule to the NMFS to complete a new rule that complies with the law within no more than 90 days from the date of the Court's MSJ Order. *Id.* at 9. "Therefore, pursuant to the Court's January 18, 2018 MSJ Order, Defendants had 90 days to complete a new rule that complie[d] with the Magnuson-Stevens Act and the APA." *Id.*

The Court then concluded that Defendants' appeal of the merits decision did not absolve it from its duty to comply with the Court's order. *Id.* Defendants did not seek a stay to relieve themselves of the requirements of the Court's order, *id.* at 10, and therefore, Defendants had not complied with the Court's order. The Court therefore granted Plaintiff's motion to enforcement the judgment and ordered the parties to file a joint status update within a month of the order

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

explaining Defendants' plan to comply with the Magnuson-Stevens Act and the APA and what progress Defendants made to that end. *Id.* The Court also ordered Defendants to promulgate a new rule in compliance with the Magnuson-Stevens Act and the APA within 90 days of the order. *Id*. at 13.

On February 19, 2019, the parties filed a joint status update regarding compliance with the Court's order. *Id.*, ECF No. 82. The parties disputed Defendants' proposed rulemaking process, as Defendants stated that they intended to skip the proposed rule and public comment steps in issuing a new Catch Rule. *Id.* at 2–8.

On February 25, 2019, the Court issued an order compelling Defendants' compliance. *Id.*, ECF No. 82. The Court held that its establishment of a deadline for the NMFS to issue a final rule did not excuse the NMFS from issuing a proposed rule and soliciting public comment. *Id*. at 4. The Court also explained that Defendants "have manufactured alleged impracticability" because Defendants "had over thirteen months to comply with" the Court's January 18, 2018 order. "Instead, Defendants have required Plaintiff to seek to enforce this order" and Defendants have "adopted a new strategy to evade the APA's proposed rule and public comment requirements." *Id.* at 5. The Court noted that "[a] finding that the Defendants are acting in bad faith may be appropriate" and that "[i]f Defendants engage in a pattern of bad faith behavior, the Court may invite a motion for sanctions." *Id*. The Court then ordered the parties to file a joint statement proposing a schedule for notice and comment rulemaking. *Id.*

On March 1, 2019, the parties filed a joint schedule. *Id*., ECF No. 83. Pursuant to the parties' joint schedule, the Court filed an order that same day requiring the NMFS to submit a proposed rule to the Office of the Federal Register for publication by April 5, 2019; provide a 15-day public comment period from the date of publication of the proposed rule in the Federal Register; and no later than May 28, 2019, submit a final rule to the Office of the Federal Register for publication. *Id.*, ECF No. 84.

### 4. The 2019 Catch Rule

On April 8, 2019, the NMFS published a proposed rule in the Federal Register to set an

10

ACL for the anchovy and other stocks managed by the CPS FMP.  AR 292:17233–17236.  The

NMFS proposed an OFL of 94,290 mt, and pursuant to Amendment 13's framework to set ABC

values at 25 percent of OFL for "a 75-percent scientific uncertainty buffer," proposed an ABC of

23,573 mt and an ACL of 23,573 mt.  *Id*. at 17233–17234.

On May 31, 2019, the NMFS published a final rule in the Federal Register ("the 2019

Catch Rule").  AR 264:16386–16392.  The 2019 Catch Rule averaged anchovy abundance

estimates from the three most recent years (2016–2018) and arrived at an average biomass of

394,519 mt.  *Id*. at 16387–16388.  The 2019 Catch Rule did not rely on the 100,000 mt default

maximum sustainable yield ("MSY") value to set the overfishing limit ("OFL"), and instead, the

NMFS calculated a new OFL by multiplying the average biomass from 2016–2018 by an estimate

of the rate of fishing mortality for anchovy at MSY (0.239).  *Id*. at 16387.  This yielded an MSY

and OFL of 94,290 mt.  *Id*. at 16387–16388.  The NMFS then calculated an acceptable biological

catch ("ABC") of 23,573 by reducing the OFL by 75% pursuant to Amendment 13.  *Id.*  The

NMFS then set the annual catch limit ("ACL") to equal the ABC at 23,573 mt.  *Id*.

### C.  Procedural History

On June 28, 2019, Plaintiff filed a complaint that challenged the OFL, ABC, and ACL set

in the 2019 Catch Rule as well as Amendments 8 and 13 to the CPS FMP.  ECF No. 1.  On July

18, 2019, the Court related the instant action to the Court's prior action involving the 2016 Catch

Rule.  ECF No. 15.

On August 23, 2019, the Court granted California Wetfish Producers Association and

Monterey Fish Company Inc.'s ("Intervenor-Defendants") unopposed motion to intervene.  ECF

No. 27.

On January 31, 2020, United States Magistrate Judge Susan van Keulen issued an order

granting in part and denying in part Plaintiff's motion to compel completion of the administrative

record.  ECF No. 49.  On February 12, 2020, the Court denied Defendant's motion for relief from

Judge van Keulen's order.  ECF No. 57.

On May 5, 2020 Judge van Keulen issued another order granting in part and denying in

11

United States District Court
Northern District of California

part Plaintiff's motion to compel production of documents withheld from the second supplemental administrative record.  ECF No. 69.

On March 17, 2020, Plaintiff filed a motion for summary judgment.  ECF No. 59 ("Plaintiff's MSJ").  On April 20, 2020, Intervenor-Defendants filed their cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment.  ECF No. 63 ("Intervenor-Defendants' MSJ").  That same day, Government Defendants also filed their cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment.  ECF No. 64 ("Government MSJ").  On May 22, 2020, Plaintiff filed its combined opposition to Defendants' motions for summary judgment and reply in support of Plaintiff's motion for summary judgment.  ECF No. 71 ("Plaintiff's Reply").  On June 11, 2020, Intervenor-Defendants and Government Defendants filed their own reply briefs in support of their cross-motions for summary judgment. ECF No. 72 ("Intervenor-Defendants' Reply"); ECF No. 73 ("Government Reply").

## II.     LEGAL STANDARD

### A.  Administrative Procedure Act Review

The Magnuson-Stevens Act adopts the Administrative Procedure Act's ("APA") "standard for judicial review of agency action set forth in 5 U.S.C. § 706(2)(A)."  *Or. Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1116 (9th Cir. 2006) (citing 16 U.S.C. § 1855(f)(1)).

Under the APA, courts must set aside an agency action where the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or was taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).  This review is deferential and narrow, and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) (quoting *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416).  Courts should overturn agency action "only when the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

12

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (internal quotation marks and citations omitted).

Nonetheless, "to withstand review the agency must articulate a rational connection between the facts found and the conclusions reached." *Bosworth,* 510 F.3d at 1023 (brackets and internal quotation marks omitted).  Courts "will defer to an agency's decision only if it is 'fully informed and well-considered.'" *Id.* (quoting *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717 (9th Cir. 1988)).

### B.  Summary Judgment

In general, summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986).

In an APA case, however, a district court's function at summary judgment is not to resolve disputed facts and make de novo factual determinations, but rather "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769–70 (9th Cir. 1985); *accord Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1472 (9th Cir. 1994) (explaining that because "this case involves review of a final agency determination under the Administrative Procedure Act, . . . resolution of this matter does not require fact finding on behalf of this court"). A court's review is therefore limited to the administrative record in all but a few exceptional circumstances.  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014).

### III.  DISCUSSION

Plaintiff argues that the overfishing limit ("OFL"), acceptable biological catch ("ABC"), and annual catch limit ("ACL") set in the 2019 Catch Rule are unlawful in three ways.  First, Plaintiff asserts that the 2019 Catch Rule violates National Standard Two because it is not based

13

on the best scientific information available.  Second, Plaintiff contends that the 2019 Catch Rule violates National Standard One because it does not prevent overfishing.  Third, Plaintiff argues that the 2019 Catch Rule violates National Standard One by failing to account for the needs of anchovy predators.

Plaintiff also argues that Amendment 13 to the Pacific Council's Coastal Pelagic Species Fishery Management Plan ("CPS FMP") is unlawful.  Specifically, Plaintiff challenges Amendment 13 both directly and as applied in the 2019 Catch Rule.

The Intervenor Defendants and the Government Defendants make overlapping summary judgment arguments, so the Court refers to them collectively as "Defendants."  The Court first considers Defendants' threshold argument that Plaintiff's direct challenge to Amendment 13 is untimely.  The Court then considers Plaintiff's argument that in directly challenging Amendment 13, Plaintiff may rely on information that post-dated Amendment 13's promulgation in 2011.  The Court concludes that Plaintiff's challenge to Amendment 13 is timely, but that based on controlling Ninth Circuit precedent, the relevant administrative record is the one compiled at the time the NMFS promulgated Amendment 13.  Because Plaintiff does not point to any evidence from that 2011 administrative record, Plaintiff's direct challenge to Amendment 13 to the CPS FMP fails.

The Court then turns to the merits of Plaintiff's arguments regarding the 2019 Catch Rule. As before, in *Oceana I,* Plaintiff may challenge Amendment 13 *as applied* in the 2019 Catch Rule. *Oceana I*, 2018 WL 1989575, at *8 (permitting challenge to Amendment 13 as applied in the 2016 Catch Rule).  The Court finds that Plaintiff prevails on the best scientific information available argument and the overfishing argument, and thus does not reach Plaintiff's claim that the 2019 Catch Rule does not account for the needs of anchovy predators.

## A.  Plaintiff's Direct Challenge To Amendment 13 To The CPS FMP Is Timely

Defendants argue that Plaintiff cannot directly challenge Amendment 13 to the CPS FMP because Amendment 13 was promulgated in 2011, and any challenge is therefore untimely. Plaintiff argues that it can directly challenge Amendment 13 because the 2019 Catch Rule is an

14

action taken under Amendment 13, and therefore, its challenge is timely.  Plaintiff's MSJ at 21.

In 2011, Amendment 13 set the anchovy's acceptable biological catch ("ABC") at 25% of overfishing limit ("OFL").  AR 196:13956.  The ABC is a catch level that accounts for scientific uncertainty around the OFL estimate, and is therefore usually a lower number.  50 C.F.R. §§ 600.310(f)(2)(ii), 600.310(f)(3); *Bryson*, 940 F. Supp. 2d at 1037.  Amendment 13 also established a framework for setting annual catch limits ("ACLs"), AR 196:13956, which the 2019 Catch Rule is implementing.  Specifically, under Amendment 13, "ACLs would likely be specified for multiple years until such time as the species becomes actively managed or new scientific information becomes available."  *Id.*

In other words, the 2019 Catch Rule implements Amendment 13's "ABC control rule . . ., which provides for a 75 percent reduction to the OFL."  AR 264:16390.  The 2019 Catch Rule then "sets the ACL equal to the ABC per the framework in the FMP," as "[t]he CPS FMP states that the ACL for stocks in the monitored management category are set equal to their ABC or lower if it is determined necessary to prevent overfishing or for other [optimum yield] considerations." *Id.* at 16387.  Finally, pursuant to Amendment 13, the 2019 Catch Rule permits the ACL to "remain in place until new scientific information becomes available to warrant changes." *Id.* at 16386.

The Magnuson-Stevens Act provides that challenges to regulations and actions must be filed within 30 days after "the date on which the regulations are promulgated or the action is published in the Federal Register."  16 U.S.C. § 1855(f)(1).  The 2019 Catch Rule was published on May 31, 2019.  AR 264:16386.  Plaintiff filed its complaint on June 28, 2019.  ECF No. 1. Plaintiff's challenge to the 2019 Catch Rule is therefore timely.  By the same token, Plaintiff's suit is untimely as to Amendment 13, which was promulgated in 2011. AR 31:933; AR 30:890.

However, as the Court previously concluded in *Oceana I* with respect to the 2016 Catch Rule, *Oregon Trollers* permits plaintiffs to challenge regulations after the 30-day period through a suit challenging an action taken under the regulation.  *Oceana I*, 2018 WL 1989575, at *7. Specifically, *Oregon Trollers* held that under section 1855(f)(1), "a petition filed within 30 days of

15

United States District Court
Northern District of California

the publication of an action may challenge both the action *and the regulation under which the action is taken*." *Or. Trollers*, 452 F.3d at 1113 (emphasis added); *Gulf Fishermen's Ass'n v. Gutierrez*, 529 F.3d 1321, 1323 (11th Cir. 2008) (adopting *Oregon Trollers* analysis); *Bryson*, 940 F. Supp. 2d at 1048 (noting that under *Oregon Trollers* "plaintiffs [may] challenge regulations after the 30 day period through a suit challenging an action taken under the regulation.").

"Actions" are defined as "actions that are taken by the Secretary under regulations which implement a fishery management plan . . . ." 16 U.S.C. § 1855(f)(2); *see Or. Trollers*, 452 F.3d at 1112–16 (discussing definition of "action"). Actions must also be published in the Federal Register. *Or. Trollers*, 452 F.3d at 1112 (citing 16 U.S.C. § 1855(f)(1)).

The 2019 Catch Rule satisfies the definition of "Actions" because the Catch Rule implements ACLs pursuant to Amendment 13 and because the Catch Rule was published in the Federal Register. AR 196:13956 (final rule for Amendment 13 noting that it sets a process for establishing ACLs); *see also* AR 264:16386–16392 (repeatedly referring to the 2019 Catch Rule as "this action"). Plaintiff therefore argues that Plaintiff's timely challenge to the 2019 Catch Rule (the action) also allows Plaintiff to challenge Amendment 13 (the regulation).

*Oregon Trollers* stemmed from a 1989 amendment to the FMP that managed Pacific salmon fisheries, including the Klamath River fall chinook. 452 F.3d at 1108–09. A 1989 amendment to the FMP sought to address declining Klamath chinook numbers by establishing an annual "escapement goal" that at least 35,000 spawning adults would survive so that they could reproduce. *Id.* at 1109. In 2005, the NMFS determined that allowing normal fishing during the upcoming fishing season would result in less than 35,000 salmon surviving to reproduce. *Id.* at 1110–11. The Service therefore placed significant restrictions on the salmon fishing season. *Id.* Thus, in *Oregon Trollers*, the 2005 fishery restrictions complied with the 1989 amendment's instruction to meet the annual "escapement goal" that at least 35,000 spawning adults would survive so that they could reproduce. *See Gulf Fishermen's*, 529 F.3d at 1322–23 (citing *Oregon Trollers* to hold plaintiff could challenge prior FMP amendment through a subsequent Service action setting deadline to comply with the FMP amendment); *Glacier Fish Co. LLC v. Pritzker*,

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

2015 WL 71084, at *2 (W.D. Wash. Jan. 6, 2015), *rev'd on other grounds*, 832 F.3d 1113 (9th Cir. 2016) (citing *Oregon Trollers* to allow plaintiff to use NMFS action setting rules for cost recovery program to challenge regulations establishing cost recovery program).

The *Oregon Trollers* plaintiffs, primarily fishermen and fishing-related businesses, brought a suit challenging the 2005 fishery restriction (the action) and the 1989 amendment (the regulation) in federal court. *Id.* at 1108, 1112. Plaintiffs' suit was commenced within 30 days of the 2005 fishery restrictions' publication in the Federal Register. *Id.* at 1111. The Service therefore did not dispute that the plaintiffs' suit was timely as to the fishery restrictions. Instead, the Service argued that plaintiffs' suit was untimely as to the underlying 1989 amendment because "under § 1855(f)(1) plaintiffs should have filed their challenge within thirty days of the promulgation of [the 1989 amendment], and . . . their suit is therefore sixteen years too late." *Id.* at 1112. The Ninth Circuit rejected this argument and held that section 1855(f)(1)'s plain language and legislative history demonstrated that plaintiffs were entitled to challenge both the action and the underlying regulation. *Id.* at 1112–13.

The instant case mirrors *Oregon Trollers*. In the instant case, Amendment 13 created a process for setting annual catch limits ("ACLs"). AR 196:13956 ("The purpose of Amendment 13 is to amend the CPS FMP to comply with . . . the new requirement to establish a process for setting ACLs . . . ."). The 2019 Catch Rule complies with Amendment 13 by implementing Amendment 13's "ABC [acceptable biological catch] control rule . . ., which provides for a 75 percent reduction to the OFL [overfishing limit]." AR 264:16390. Furthermore, pursuant to Amendment 13, the 2019 Catch Rule "sets the ACL [annual catch limit] equal to the ABC [acceptable biological catch] per the framework in the FMP [fishery management plan]," as "[t]he CPS FMP [Coastal Pelagic Species Fishery Management Plan] states that the ACL [annual catch limit] for stocks in the monitored management category are set equal to their ABC [acceptable biological catch] or lower if it is determined necessary to prevent overfishing or for other [optimum yield] considerations." *Id*. at 16387. Finally, pursuant to Amendment 13, the 2019 Catch Rule permits the ACL [annual catch limit] to "remain in place until new scientific

17

1   information becomes available to warrant changes." *Id.* at 16386.

2       In sum, the Court finds that Plaintiff's timely challenge to the 2019 Catch Rule also allows

3   Plaintiff to directly challenge Amendment 13.  In particular, Plaintiff may directly challenge

4   Amendment 13's decision to set the anchovy's acceptable biological catch ("ABC") and annual

5   catch limit ("ACL") at 25% of overfishing limit ("OFL") and the ability to set annual catch limits

6   ("ACLs") "for multiple years until such time as the species becomes actively managed or new

7   scientific information becomes available." AR 196:13956.  Furthermore, Plaintiff may also timely

8   challenge Amendment 13 as applied in the 2019 Catch Rule.

9   **B.  Plaintiff May Only Rely Upon Evidence That Was Presented To The NMFS In 2011 In Directly Challenging Amendment 13 To The CPS FMP**

10      The Court next considers what evidence Plaintiff may rely upon in directly challenging

11  Amendment 13.  Plaintiff argues that it may rely upon evidence compiled after the 2011

12  promulgation of Amendment 13—specifically, the administrative record in the instant case.

13  Defendants contend that the relevant administrative record is the one compiled at the time the

14  NMFS promulgated Amendment 13.  Plaintiff's Reply at 32–33.  Notably, Plaintiff's challenge to

15  Amendment 13 is based entirely on evidence compiled after the 2011 promulgation of

16  Amendment 13.  Therefore, if the relevant administrative record is the one compiled in 2011—

17  when the NMFS promulgated Amendment 13—Plaintiff's challenge to Amendment 13

18  necessarily fails.

19      "Judicial review of an agency decision typically focuses on the administrative record in

20  existence at the time of the decision . . . ." *Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.*,

21  100 F.3d 1143, 1450 (9th Cir. 1996).  Generally speaking, "[p]arties may not use 'post-decision

22  information as a new rationalization either for sustaining or attacking [an] [a]gency's decision.'"

23  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006)

24  (quoting *Ass'n of Pac. Fisheries v. EPA,* 615 F.2d 794, 811–12 (9th Cir. 1980)).  "When a

25  reviewing court considers evidence that was not before the agency, it inevitably leads the

26  reviewing court to substitute its judgment for that of the agency." *San Luis & Delta-Mendota*

27

28

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

*Water Auth.*, 747 F.3d at 602 (quoting *Asarco, Inc. v.* EPA, 616 F.2d 1153, 1160 (9th Cir. 1980)). Again, the Ninth Circuit's decision in *Oregon Trollers* is relevant and decisive for resolving what evidence Plaintiff may utilize in challenging Amendment 13.

In *Oregon Trollers*, after the Ninth Circuit concluded that the plaintiffs' challenge to the 1989 regulation to the FMP was timely, the Ninth Circuit addressed the merits.  452 F.3d at 1117. The *Oregon Trollers* plaintiffs brought three challenges, but the most relevant for current purposes was the plaintiffs' second challenge that the 1989 regulation was not based on the best scientific information available.  *Id*. at 1117, 1119–120.  The Ninth Circuit noted that the *Oregon Trollers* plaintiffs "did not introduce any evidence to dispute the scientific basis for the [1989] escapement goal" and "plaintiffs frame their argument purely in terms of statutory interpretation."  *Id*. at 1119. According to the Plaintiff in the instant case, this fact distinguishes *Oregon Trollers* from the instant case because here, Plaintiff introduces considerable evidence to challenge Amendment 13. Plaintiff, however, misreads *Oregon Trollers*.

Although the Ninth Circuit did in fact note that the *Oregon Trollers* plaintiffs did not introduce any new evidence, the court did not stop its analysis there.  Rather, the Ninth Circuit explicitly concluded that "[e]ven if plaintiffs had attacked the evidentiary basis for the escapement goal established in the 1989 regulation, . . . [t]he relevant administrative record for these purposes is the record compiled in 1989 to support the FMP amendment that established the escapement goal."  452 F.3d at 1120 (citing 50 C.F.R. § 600.315(b)(2) (providing that an FMP "must take into account the best scientific information available at the time of preparation")).  Because evidence from the 1989 administrative record supported the agency's decision, the Ninth Circuit rejected the plaintiffs' argument.  *Id*.  Therefore, contrary to Plaintiff's assertions, the Ninth Circuit stated that in challenging an older regulation upon which a newer action was based, a plaintiff can only rely on the record compiled at the time the older regulation was promulgated.  *Id*.

This explicit holding from *Oregon Trollers* is dispositive.  Here, Plaintiff may timely challenge Amendment 13, which was promulgated in 2011, because the 2019 Catch Rule's overfishing limit ("OFL"), acceptable biological catch ("ABC"), and annual catch limit ("ACL")

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

values are based on Amendment 13.  In doing so, however, "[t]he relevant administrative record for these purposes is the record compiled in" 2011 to support Amendment 13.  *Id.*  As a result, because Plaintiff's challenge to Amendment 13 is based entirely on evidence compiled after the 2011 promulgation of Amendment 13, Plaintiff's direct challenge to Amendment 13 necessarily fails.

The Court therefore GRANTS Intervenor-Defendants' and Government Defendants' cross-motions for summary judgment and DENIES Plaintiff's motion for summary judgment with respect to Plaintiff's direct challenge to Amendment 13 to the Coastal Pelagic Species Fishery Management Plan ("CPS FMP").

The Court notes, however, that Defendants do not dispute that Plaintiff may challenge Amendment 13 as applied in the 2019 Catch Rule and that Plaintiff may rely upon the instant case's administrative record to do so.  Government Reply at 13–14.  Similarly, in *Oceana I*, the Court held that Plaintiff could challenge Amendment 13 as applied in the 2016 Catch Rule based on the evidence then before the Court.  *Oceana I*, 2018 WL 1989575, at *8 (permitting challenge to Amendment 13 as applied in the 2016 Catch Rule).  Thus, although Plaintiff's direct challenge to Amendment 13 fails, Plaintiff may still challenge Amendment 13 as applied in the 2019 Catch Rule and Plaintiff may rely on the instant case's administrative record to do so.  With this clarification in mind, the Court next proceeds to the merits of Plaintiff's challenge to the 2019 Catch Rule.

**C. The 2019 Catch Rule Violates National Standard Two's Requirement That Actions Be Based Upon The Best Scientific Information Available**

Plaintiff and Defendants dispute whether the 2019 Catch Rule complies with National Standard Two's requirement that actions be "based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).  Plaintiff argues that the 2019 Catch Rule unlawfully set the overfishing limit ("OFL"), acceptable biological catch ("ABC"), and annual catch limit ("ACL") based only on average abundance data from 2016 to 2018, a timeframe when the anchovy population was increasing.  According to Plaintiff, in setting those limits, the NMFS effectively ignored two

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

recent studies, MacCall (2016) and Thayer *et al.* (2017), which purportedly demonstrate that anchovy abundance fluctuates widely such that setting the OFL, ABC, and ACL based only on 2016 to 2018 is not based on the best scientific information available.  Instead, Plaintiffs contend that the NMFS had to also consider MacCall (2016) and Thayer *et al.* (2017), which analyze anchovy abundance data from 1951 to 2015 and are the only studies showing anchovy biomass estimates from 2009-2014, when anchovy abundance was particularly low.

Defendants primarily advance two arguments in response.  First, Defendants argue that the NMFS could reasonably reject the MacCall (2016) and Thayer *et al.* (2017) studies based on methodological uncertainties present in the studies.  Second, Defendants contend that in any event, the NMFS did consider the scientific information in MacCall (2016) and Thayer *et al.* (2017) and found that the evidence was consistent with the limits set in the 2019 Catch Rule.  The Court addresses each of Defendant's arguments in turn and finds that neither is persuasive.  The Court therefore concludes that MacCall (2016) and Thayer *et al.* (2017) are the best scientific information available and that Defendants improperly failed to address this evidence in violation of National Standard Two.

### 1.  The NMFS Fails to Discredit Plaintiff's Evidence

Defendants' first argument is that Plaintiff's scientific evidence is so flawed that the NMFS could wholly disregard it.  Plaintiff claims that its scientific evidence is the best scientific information available, and therefore the NMFS had to consider it.

National Standard Two of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  Regulations defining National Standard Two further specify that fishery management measures "must take into account the best scientific information available at the time of preparation," 50 C.F.R. § 600.315(b)(2), which includes "biological, ecological, environmental, economic, and sociological scientific information," *id*. § 600.315(a)(1).  As the Court previously explained, the NMFS "'may not disregard superior data' and section 1851(a)(2) challenges may prevail if 'there is some indication that superior or contrary data was available and that the agency

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

1   ignored such information.'"  *Oceana I*, 2018 WL 1989575, at *9 (quoting *Guindon v. Pritzker*, 31

2   F. Supp. 3d 169, 195 (D.D.C. 2014)).

3         Plaintiff's scientific evidence concerns two studies, MacCall (2016) and Thayer *et al.*

4   (2017).  MacCall (2016) is a 2016 peer-reviewed study led by former NMFS scientist Alec

5   MacCall, who produced prior anchovy stock estimates and co-authored the Northern Anchovy

6   Fishery Management Plan, which was later expanded into the current Coastal Pelagic Species

7   Fishery Management Plan ("CPS FMP").  AR 417: 19372–19379 (Alec MacCall, et al., *Recent*

8   *collapse of northern anchovy biomass off California*, 175 Fisheries Research 87–94 (2016)).

9         Thayer *et al.* (2017) is a 2017-peer reviewed study that builds on the analysis of MacCall

10  (2016) and extends anchovy abundance estimates past 2011.  AR 388:18917–18924 (J.A. Thayer,

11  *et al.*, *California Anchovy Population Remains Low*, 58 CalCOFI Rep. 69–76 (2017)).  Thayer *et*

12  *al.* (2017)'s lead author is Julie Thayer, one of the co-authors of MacCall (2016).  *Id.*  The

13  remaining co-authors for Thayer *et al.* (2017) are the same co-authors as MacCall (2016),

14  including Alec MacCall.  *Id.*

15        MacCall (2016) and Thayer *et al.* (2017) provide analyses of anchovy abundance data from

16  1951 to 2015 and reveal that anchovy abundance has fluctuated far more dramatically than

17  previous studies showed.  AR 417: 19372–19379; AR 388:18917–18924.  For example, Thayer *et*

18  *al.* (2017) concluded that anchovy biomass dropped 77% in a single year (1986 to 1987), dropped

19  90% over a two-year period (2005 to 2007), and dropped by 99% over a four-year period (2005 to

20  2009).  AR 282:16459–60, 1611–12, 16614; AR 388:18920, 18924.  In light of this evidence,

21  Plaintiff contends that the catch limits in the 2019 Catch Rule are insufficient to prevent

22  overfishing "when abundance levels drop by more than 90 percent below the average biomass NM

23  FS assumed as the basis for its catch limits."  Plaintiff's MSJ at 9.  Indeed, according to the

24  scientific evidence, anchovy abundance levels remained historically low through 2014.  AR

25  388:18924.

26        Defendants contend that the NMFS did not have to take these scientific studies into

27  account when promulgating the 2019 Catch Rule because these scientific studies were so flawed

28
22

United States District Court
Northern District of California

1    that the NMFS could wholly disregard them.  AR 264:16388–16389; Government MSJ at 6.

2    Specifically, Defendants argue that "Thayer [*et al.* (2017)] (which extends the [MacCall (2016)]

3    estimates beyond 2011) calculated the anchovy abundance in 2015 [at] only 5,300 [mt]" but then

4    updated their 5,300 mt estimate for 2015 to 92,100 mt.  Government MSJ at 6.  Defendants argue

5    that this is proof that Thayer *et al.* (2017) is unreliable, and that because MacCall (2016) and

6    Thayer *et al.* (2017) failed to update their comparatively low biomass estimates from 2009 to

7    2014, the NMFS could properly disregard estimates from those years.

8         The Court disagrees.  First, Defendants' central contention—namely, that Thayer et al.

9    (2017) is inaccurate and unreliable because the scientific study updated its anchovy abundance

10   estimates for 2015, yet failed to "correct" its estimates for 2009 to 2014—fails on the facts.  As

11   Plaintiff points out, Thayer *et al.* (2017) provided anchovy abundance estimates for 1951 to 2015

12   based on data collected from annual California Cooperative Oceanic Fisheries Investigation

13   ("CalCOFI") surveys that count anchovy eggs and larvae.  AR 388:18917–18919.  Generally, two

14   CalCOFI surveys occur every year, one in the spring and one in the winter.  However, in 2015,

15   only data from the earlier 2015 survey was available at the time Thayer *et al.* (2017) prepared its

16   preliminary abundance estimate for 2015.  AR 388:18919.  Indeed, the 2015 preliminary

17   abundance estimate in Thayer *et al.* (2017) explicitly noted that "[a]s of this analysis, January data

18   were not yet available for 2015."  *Id.*  When the authors of Thayer *et al.* (2017) updated their 2015

19   estimates in 2018, they explained that "as new CalCOFI data . . . bec[ame] available," the authors

20   of Thayer *et al.* (2017) then updated their 2015 anchovy abundance estimates.  AR 350:17991.

21   Nowhere did Thayer *et al.* (2017) make any suggestion that estimates from 2009 to 2014 needed

22   "updating" or "correcting," as those estimates already reflected data from all spring and winter

23   surveys for those years.

24        Defendants entirely fail to respond to Plaintiff's explanation about the update to 2015

25   anchovy abundance estimates in Thayer et al. (2017).  Not surprisingly, Defendants' reply briefs

26   abandon their argument that Plaintiff's proffered evidence was unreliable and could therefore be

27   disregarded.

28

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

Second, the NMFS does not present any alternative abundance estimates for 2009 to 2014, the years in which Thayer *et al.* (2017) estimate historically low anchovy abundance. Without any competing information to rely upon, the NMFS could not have concluded that Thayer *et al.* (2017) and its estimates for 2009 to 2014 were not the best scientific information available. *See Or. Trollers*, 452 F.3d at 1120 (upholding the NMFS's fishery restrictions because plaintiffs had pointed to no scientific information better than the information on which the NMFS relied); *Midwater Trawlers Coop.*, 393 F.3d at 1003 ("[B]y specifying that decisions be based on the best scientific information *available*, the [MSA] recognizes that such information may not be exact or totally complete." (emphasis in original)).

Instead, the Court concludes that MacCall (2016) and Thayer *et al.* (2017) constitute the best scientific information available regarding recent anchovy abundance estimates and anchovy population fluctuations.

### 2. The Overfishing Limit, Acceptable Biological Catch, and Annual Catch Limit Were Not Based On The Best Scientific Information Available

In the alternative, Defendants contend that even if MacCall (2016) and Thayer *et al.* (2017) constitute the best scientific information available, the NMFS did not disregard these scientific studies in crafting the 2019 Catch Rule. According to Defendants, though the NMFS only utilized data from 2016 to 2018 to set the OFL, ABC, and ACL, the average biomass from 2016 to 2018 was generally in line with the average biomass estimates from MacCall (2016) and Thayer *et al.* (2017), such that the Court should find that the NMFS did consider the best scientific information available.

Specifically, as noted above, the 2019 Catch Rule set the OFL, ABC, and ACL by analyzing anchovy abundance estimates from 2016 to 2018, which were years where the anchovy population was rapidly increasing. AR 264:16387–16388. With anchovy abundance estimates of 151,558 mt (2016), 308,173 mt (2017), and 823,826 mt (2018), the 2019 Final Rule calculated an average biomass of 394,519 mt. *Id.* at 16388. The NMFS then multiplied this average by an estimate of the rate of fishing mortality for anchovy at MYS (0.239), which yielded an OFL of

24

United States District Court
Northern District of California

1   94,290 mt.  *Id*.  The NMFS then calculated an ABC of 23,573 by reducing the OFL by 75%

2   pursuant to Amendment 13 and set the ACL to equal the ABC at 23,573 mt.  *Id*.

3        In crafting the 2019 Catch Rule, the "NMFS note[d] . . . that if one were to compare the

4   MacCall and Thayer time series of biomass estimates to the information that [the] NMFS used to

5   calculate the OFL in this final rule, the range of estimates . . . are actually fairly similar."  AR

6   264:16389.  According to the NMFS, "the Thayer papers actually produce[] an average biomass

7   value of 425,000 mt[], which is higher than the average of the three years used by NMFS."  *Id*.

8        Defendants' argument fails because this simple comparison does not demonstrate that the

9   NMFS actually considered the specific scientific information in MacCall (2016) and Thayer *et al.*

10  (2017).  "Stating that a factor was considered . . . is not a substitute for considering it."  *Beno v.*

11  *Shalala*, 30 F.3d 1057, 1075 (9th Cir. 1994) (quotation marks and citation omitted).  Together,

12  MacCall (2016) and Thayer *et al.* (2017)) provide analyses of anchovy abundance data from 1951

13  to 2015 and reveal that anchovy abundance has fluctuated far more dramatically than previous

14  studies showed.  AR 417: 19372–19379; AR 388:18917–18924.  For example, Thayer *et al.*

15  (2017) concluded that anchovy biomass dropped 77% in a single year (1986 to 1987), dropped

16  90% over a two-year period (2005 to 2007), and dropped by 99% over a four-year period (2005 to

17  2009).  AR 282:16459–60, 1611–12, 16614; AR 388:18920, 18924.

18       This data is especially probative.  In 2005, the anchovy population reached nearly 2

19  million mt before plummeting to less than 20,000 mt by 2009.  AR 388:18924.  Then, from 2009

20  to 2014, the anchovy population never exceeded 20,000 mt except for a single year.  *Id*.

21  Moreover, MacCall (2016) and Thayer *et al*. (2017) demonstrate that in recent years, drastic

22  population increases typically last for shorter periods while the periods of low abundance

23  following such population booms tend to last for longer periods.  *Id*. at 18920 (figure showing that

24  since 1990, population increases typically last for shorter periods while subsequent periods of low

25  abundance can last longer periods).

26       The evidence in the record does not demonstrate that NMFS considered any of this

27  evidence in promulgating the 2019 Catch Rule.  Rather, the NMFS first attempted to discredit this

28

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   evidence, and when that failed, merely asserted that it considered this evidence because the long

2   term averages from MacCall (2016) and Thayer *et al*. (2017), which analyzed anchovy abundance

3   data from 1951 to 2015, approximated the average anchovy biomass estimates from 2016 to 2018.

4   But by averaging anchovy biomass estimates and setting unchanging OFL, ABC, and ACL values

5   for an indefinite period of time, the 2019 Catch Rule entirely fails to account for drastic anchovy

6   population fluctuations that are only documented by MacCall (2016) and Thayer *et al.* (2017).

7   The 2019 Catch Rule's framework fails to consider its effects on the anchovy population when the

8   best scientific information available establishes that the anchovy population can drop by as much

9   as 77% in a single year, 90% over two years, or even 99% over four years.  AR 388:18924.

10      Faced with this information, the Court concludes that the OFL, ABC, and ACL as set in

11   the 2019 Catch Rule are arbitrary and capricious because the NMFS has "offered an explanation

12   for its decision that runs counter to evidence before the agency."  *Pac. Dawn*, 831 F.3d at 1173.

13   Put differently, the Court finds that the NMFS acted arbitrarily and capriciously because the 2019

14   Catch Rule fails to "articulate a rational connection between the facts found and the conclusions

15   reached."  *Bosworth*, 510 F.3d at 1023.

16      The Court also concludes that the NMFS's dismissal of MacCall (2016) and Thayer *et al.*

17   (2017) is arbitrary and capricious because it is "so implausible that it could not be ascribed to a

18   difference in view or the product of the agency's expertise."  *Pac. Dawn*, 831 F.3d at 1173.  The

19   NMFS dismisses these two peer-reviewed scientific studies on the basis that one of them, Thayer

20   *et al*. (2017) updated its anchovy estimate for 2015.  But as the Court explained, Defendants'

21   argument fails because Thayer *et al.* (2017) explicitly noted that its update to the 2015 data was

22   due to the unavailability of a winter 2015 survey that counts anchovy eggs and larvae and that

23   updates for other years were unnecessary because the survey data was available for the other

24   years.

25      Moreover, the fact that the NMFS calculated unchanging OFL, ABC, and ACL values for

26   an indefinite period of time based on data from 2016 to 2018—years in which the anchovy

27   population was drastically increasing—demonstrates that the NMFS did not consider the best

28

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

scientific information available from MacCall (2016) and Thayer *et al.* (2017).

In sum, the Court concludes that the OFL, ABC, and ACL are arbitrary and capricious because the OFL, ABC, and ACL are not based on the best scientific information available.

### D. The 2019 Catch Rule Violates National Standard One's Requirement to Prevent Overfishing

Plaintiff next argues that the OFL, ABC, and ACL violate National Standard One because they do not prevent overfishing.  16 U.S.C. § 1851(a)(1).  Specifically, Plaintiff argues that the NMFS's decision to set static OFL, ABC, and ACL values for an indefinite period of time will not prevent overfishing because (1) anchovy abundance is known to drop well below those limits, and (2) the 75% buffer between the OFL and the ABC and ACL fails to account for the drastic population variability evidence in the record.

National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  *Id.*  Overfishing is a rate of fishing "that jeopardizes the capacity of a fishery to produce [MSY] on a continuing basis."  *Id.* § 1802(34).  MSY is "the largest long-term average catch or yield that can be taken from a stock."  Consequently, overfishing is "a rate of fishing which would jeopardize the capacity of a fishery to produce the [MSY] on a continuing basis."  *Bryson*, 940 F. Supp. 2d at 1036.

The preceding discussion of the best scientific information largely resolves this dispute. As discussed above, Plaintiff has provided substantial evidence that the anchovy population is prone to drastic population fluctuations and has done so in recent years.  Nonetheless, the NMFS crafted the OFL, ABC, and ACL values in the 2019 Catch Rule by averaging anchovy biomass from only three years with relatively high anchovy abundance (2016 to 2018) and ignoring data from years with low anchovy abundance.  Again, the 2019 Catch Rule set the OFL, ABC, and ACL by analyzing anchovy abundance estimates from only 2016 to 2018, which were years where the anchovy population was rapidly increasing.  AR 264:16387–16388.  With anchovy abundance estimates of 151,558 mt (2016), 308,173 mt (2017), and 823,826 mt (2018), the 2019 Final Rule

27

United States District Court
Northern District of California

1    calculated an average biomass of 394,519 mt.  *Id.* at 16388.  This value was drastically higher than

2    anchovy abundance estimates from 2009 to 2014, where estimates typically placed the anchovy

3    population at no more than 20,000 mt.  The NMFS then multiplied the 394,519-mt average by an

4    estimate of the rate of fishing mortality for anchovy at MYS (0.239), which yielded an OFL of

5    94,290 mt.  *Id.*  The NMFS then calculated an ABC of 23,573 by reducing the OFL by 75%

6    pursuant to Amendment 13 and set the ACL to equal the ABC at 23,573 mt.  *Id.*

7            The NMFS then set the ACL's 23,573 mt limit for an indefinite period of time without a

8    mechanism to respond to significant changes in anchovy abundance, even though the best

9    scientific information available established that anchovy population fluctuations are common and

10   extreme.  Given this backdrop, it was at minimum arbitrary and capricious for the NMFS to fail to

11   consider whether the OFL, ABC, and ACL would still prevent overfishing, especially given that

12   the anchovy population will fluctuate again in the future.

13           Furthermore, though the NMFS reduced the OFL by 75% to calculate the ABC and ACL,

14   such reductions will again be insufficient in years when the anchovy population drastically

15   declines.  Again, as an example, Thayer *et al.* (2017) concluded that anchovy biomass dropped

16   77% in a single year (1986 to 1987), dropped 90% over a two-year period (2005 to 2007), and

17   dropped by 99% over a four-year period (2005 to 2009).  AR 282:16459–60, 1611–12, 16614; AR

18   388:18920, 18924.  The precautionary 75% buffer between the OFL and the ABC and ACL would

19   not prevent overfishing when the anchovy population similarly decreases in the future.

20           Defendants offer three arguments in response.  First, Defendants argue that the recent

21   anchovy population increases demonstrate that overfishing will not occur.  Second, Defendants

22   claim that evidence in the record supports the NMFS's decision to set unchanging OFL, ABC, and

23   ACL values for an indefinite period of time.  Third, Defendants argue that because anchovy

24   population fluctuations are the result of changing environmental conditions and not fishing, setting

25   the 2019 Catch Rule's OFL, ABC, and ACL at historical values will not lead to overfishing.  The

26   Court addresses each in turn and finds that none is persuasive.

27       **1.  Recent Increases In The Anchovy Population Do Not Establish That The 2019**

28
Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

**Catch Rule Will Prevent Overfishing**

First, Defendants contend that even if the anchovy stock declined to similarly low levels as calculated in MacCall (2016) and Thayer *et al.* (2017), overfishing is unlikely to occur because following the "relatively lower levels [of anchovy biomass]" from 2009 to 2015, "fishing continued at historical levels and the stock recovered very substantially in the immediately following years according to all of the available biomass estimates." AR 264:16390–16391.

Put differently, Defendants' argument is that though the anchovy population drastically declined from 2009 to 2015, fishing continued apace, and in the immediate years, the anchovy population rebounded such that fishing from 2009 to 2015 was not at a rate that "jeopardize[d] the capacity of [the] fishery to produce the [MYS] on a continuing basis." *See Bryson*, 940 F. Supp. 2d at 1036. Therefore, because the NMFS seeks to set OFL, ABC, and ACL values similar to those from 2009 to 2015, the NMFS argues that it will necessarily prevent overfishing.

This argument is misleading. Defendants consistently argue that overfishing did not occur even during years of low abundance because "fishing continued at historical levels through that whole period." Government MSJ at 2, 16. However, fishing at historical levels has never approximated the actual limits set in the ACL. As Intervenor-Defendants acknowledge, and the evidence supports, "[s]ince 1983[,] the average catch of norther anchovy . . . has been ~7,000 metric tons." 2016 AR 62:1278; Intervenor-Defendants' MSJ at 2 ("[C]atch levels declined precipitously and have remained low—approximately 7000 MT on average since 1982."). Indeed, the 2019 Catch Rule itself notes that "[t]he annual average harvest from 2009 to 2018 for central anchovy was 7,020 mt." AR 264: 16392. In other words, anchovy fishing has "remained well below [its] respective ABC/ACL levels [of 25,000 mt] since implementation of the CPS FMP in 2000." 2016 AR 165:2879; *see also id.*, fig. 2 (comparing annual catches of anchovy to ACL of 25,000 mt). This is particularly true for 2009 to 2013, when fishing levels were even lower. Supp. AR 11:19868 (2,668 mt in 2009; 1,026 mt in 2010; 2,601 mt in 2011; 2,488 mt in 2012; and 6,019 mt in 2013).

Therefore, the recent increases do not establish that the current 23,573-mt ACL limit will

United States District Court
Northern District of California

1   prevent overfishing.  As such, Defendants' first argument fails.

2   **2.  Defendants' Single Piece of Proffered Evidence Does Not Demonstrate That Setting Static OFL, ABC, and ACL Values For an Indefinite Period of Time Will Prevent Overfishing**

3

4   Defendants' second argument is that evidence in the record shows that setting static OFL,

5   ABC, and ACL values for an indefinite period of time is more than 50% likely to prevent

6   overfishing as is required by National Standard One.  As previously discussed, "Congress

7   . . . recognized that a certain amount of scientific uncertainty in predicting a stock's overfishing

8   level is inevitable," and as a result, National Standard One guidelines "operate to ensure that there

9   is no greater than a 50% probability that overfishing will occur."  *Oceana, Inc. v. Locke*, 831 F.

10  Supp. 2d 95, 128 (D.D.C. 2011) (citing 50 C.F.R. § 600.310(f)); *Massachusetts v. Pritzker*, 10 F.

11  Supp. 3d 208, 213 (D. Mass. 2014) ("The objective of the control rule is to provide a buffer

12  between OFL and ABC such that there is less than a 50% chance that overfishing will occur.").

13  50 C.F.R. § 600.310(f)(2)(i) states that ABC "could be based on an acceptable probability (at least

14  50 percent) that catch equal to the stock's ABC will not result in overfishing."

15  Here, Defendants point to an analysis conducted by Dr. Andre E. Punt of the University of

16  Washington for the Pacific Council's Scientific and Statistical Committee.  AR 309:17390; AR

17  310:17408.  The analysis shows that less frequent adjustments to OFL can protect against

18  overfishing where there is a large buffer or reduction from OFL to ABC.  AR 310:17409.

19  Specifically, Dr. Punt states that the probability of the stock being overfished is 20.5% for annual

20  OFLs, 27.5% for two-year OFLs, 38.7% for five-year OFLs, and 38.8% for ten-year OFLs.  AR

21  310:17409.  Based on this, Defendants assert that "[w]hile longer-term OFLs were associated with

22  higher risk, the level of risk with a constant OFL over several years was still well below the 50%

23  risk level allowed by the MSA."  Intervenor-Defendants MSJ at 6.

24  As Plaintiff points out, Dr. Punt's analysis is not relevant to the 2019 Catch Rule.  Most

25  importantly, Dr. Punt's analysis does not rely on the 2019 Catch Rule's MSY.  Instead, the

26  analysis relies on far lower long-term MSY values.  Specifically, Dr. Punt's analysis relies on

27  MSY values ranging from 18,000 mt to 61,000 mt, AR 309:17398, but the 2019 Catch Rule

28

30

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

1    utilizes an MSY of 94,290 mt.  AR 264:25196 (2019 Catch Rule explaining that "OFLs are set

2    equal to estimates of MSY" and setting OFL at 94,290 mt).  The 2019 Catch Rule never utilizes

3    Dr. Punt's MSY values in setting the OFL, ABC or ACL.  To reiterate, MSY—or maximum

4    sustainable yield—is important because overfishing is "a rate of fishing which would jeopardize

5    the capacity of a fishery to produce the [MSY] on a continuing basis."  *Bryson*, 940 F. Supp. 2d at

6    1036; 16 U.S.C. § 1802(34) (defining overfishing as "a rate or level of fishing mortality that

7    jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing

8    basis").

9         Defendants do not engage with the substance of Plaintiff's argument or attempt to explain

10   how Dr. Punt's analysis remains relevant in light of these stark differences.  Government Reply at

11   8–9.  Instead, Defendants conclusorily state that these are mere methodological objections and

12   should be discounted.  *Id*.  As a result, Defendants fail to adequately respond to Plaintiff's

13   argument that Dr. Punt's analysis is not pertinent to the OFL, ABC, and ACL values as set in the

14   2019 Catch Rule.  The Court therefore rejects Defendant's second argument.

15            **3.   The Fact That Environmental Conditions Drive Anchovy Population Fluctuations
16                   Does Not Support The NMFS's Position That The 2019 Catch Rule Will Prevent
                     Overfishing**

17        Defendant's final argument is that fishing at current levels is not responsible for anchovy

18   population declines and that instead, environmental conditions are largely driving the drastic

19   anchovy population fluctuations.  Therefore, Defendants assert that historical catch limits have a

20   limited effect on the anchovy population, which will rebound as environmental conditions return

21   to normal.  As a result, Defendants assert that the 2019 Catch Rule's limits, which are largely

22   consistent with prior limits, will prevent overfishing and that the NMFS did not need to consider

23   how fishing levels may interact with environmental conditions to impact the anchovy population.

24   Government Reply at 6 ("[A]s NMFS found in adopting the guidelines, a decline in biomass in a

25   given year due to temporary environmental factors while fishing continues does not mean that

26   . . . there is 'overfishing.'").

27        Defendants' position contradicts the NMFS's own regulatory guidelines, which require the

28
Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    NMFS to consider environmental conditions in setting catch limits.  To begin, MSY is itself

2    defined as "the largest long-term average catch or yield that can be taken from a stock or stock

3    complex under prevailing ecological, environmental conditions and fishery technological

4    characteristics."  50 C.F.R. § 600.310(e)(1)(i)(A).  Elsewhere, the governing guidelines recognize

5    that management measures consider and address environmental changes.  For example, the

6    regulations state that "Councils should consider the management objectives of their FMPs and

7    their management framework to determine the relevant social, economic, and ecological factors

8    used to determine [optimum yield]."  *Id*. § 600.310(e)(3)(iii)(B).  In giving examples of ecological

9    factors that should be considered, the regulations explicitly recognize that "ecological or

10   environmental conditions that stress marine organisms or their habitat, such as natural and

11   manmade changes," are "[a]lso important."  *Id*. § 600.310(e)(3)(iii)(B)(3).  In sum, to simply state

12   that anchovy abundance is largely driven by environmental conditions does not absolve the NMFS

13   from its responsibility to take those environmental conditions into account when setting the OFL,

14   ABC, and ACL.

15         Moreover, the need to account for environmental conditions alongside fishing is all the

16   more salient because evidence indicates that fishing can exacerbate natural declines in the anchovy

17   population.  Defendants repeatedly cite to a 2018 study authored by Sam McClatchie of the

18   NOAA Fisheries Service, Southwest Fisheries Science Center, Fisheries Resources Division, and

19   others.  AR 348:17975–17977 (S. McClatchie, R.D. Vetter, and I.L. Hendy, *Forage fish, small*

20   *pelagic fisheries and recovering predators: managing expectations*, 21 Animal Conservation 445–

21   47 (2018)); *see* Government MSJ at 14, 21 (citing McClatchie (2018)); Government Reply at 7

22   (same).  Defendants rely on McClatchie (2018) for its statement that "it is well documented that

23   forage fish populations collapse repeatedly and these collapses are a common feature of sardine

24   and anchovy population dynamics, even in the absence of commercial fishing."  AR 348:17976.

25   However, McClatchie (2018) also notes that "it is recognized that fishing pressure on pelagic

26   forage fish [such as anchovy] can increase the probability, and even the rate of stock collapse."  *Id*.

27         Other evidence confirms this finding.  For example, an October 2018 letter from Dr. Simon

28   
Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

1    Dedman of the Farallon Institute that was sent to the Pacific Council noted that "[t]he high

2    efficiency of commercial fishing has scope to combine catastrophically with anchovy's habit of

3    pooling in high densities inshore when their total abundance is low, such that an inappropriately

4    high ACL could presage a population crash." AR 366:18233 (quoting multiple studies). Indeed, a

5    peer-reviewed 2015 study analyzing "small pelagic fish, such as herrings, anchovies, and

6    sardines," noted that fishing can "exacerbate naturally caused collapses, because shifts in

7    populations' spatial distributions coupled with fish schooling behavior allows fisheries to be

8    economically viable even when abundance is low." AR 282:16523 (Timothy E. Essington et al.,

9    *Fishing amplifies forage fish population collapses* (2015)).

10    Defendants attempt to discredit this 2015 peer-reviewed study because the study analyzed

11    fishing populations that were subject to high levels of fishing—sometimes in excess of 60% of

12    biomass. *See id*. at 16525. What Defendants fail to recognize, however, is that in the years when

13    the anchovy population drastically declines—such as when the anchovy population declined 90%

14    from 2005 to 2007—fishing could reach similar levels as a proportion of total biomass. Indeed, as

15    noted previously, MacCall (2016) and Thayer *et al.* (2017) noted that from 2009 to 2014, the

16    anchovy population crashed and stayed below 20,000 mt for a prolonged period. Fishing at levels

17    permissible under the 2019 Catch Rule—specifically, the ACL of 23,573 mt—would have

18    resulted in high levels of fishing—the type which the aforementioned study noted could

19    "exacerbate naturally caused collapses." AR 282:16523.

20    Accordingly, the NMFS was required to consider the substantial evidence in the record

21    indicating that fishing could exacerbate population fluctuations and declines, even if the

22    population fluctuations were largely driven by environmental factors.

23    In sum, it was arbitrary and capricious for the NMFS to set static OFL, ABC, and ACL

24    values for an indefinite period of time because the evidence did not demonstrate that those limits

25    would prevent overfishing. Instead, evidence demonstrated that anchovy abundance is known to

26    drop below the limits set in the 2019 Catch Rule and that the 75% buffer between the OFL and the

27    ABC and ACL does not account for drastic anchovy population variability. As a result, the NMFS

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

has "offered an explanation for its decision that runs counter to evidence before the agency." *Pac.*

*Dawn*, 831 F.3d at 1173.

Accordingly, the Court GRANTS Plaintiff's motion for summary judgment and DENIES Intervenor-Defendants' and Government Defendants' cross-motions for summary judgment with respect to Plaintiff's challenge to the 2019 Catch Rule.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Intervenor-Defendants' and Government Defendants' cross-motions for summary judgment and DENIES Plaintiff's motion for summary judgment with respect to Plaintiff's direct challenge to Amendment 13 to the CPS FMP.  The Court GRANTS Plaintiff's motion for summary judgment and DENIES Intervenor-Defendants' and Government Defendants' cross-motions for summary judgment with respect to Plaintiff's challenge to the 2019 Catch Rule.

The Court therefore VACATES the 2019 Catch Rule and remands the 2019 Catch Rule for further action consistent with this order.  The Court declines Plaintiff's invitation to "require" the NMFS to "issue a new catch rule [that] ensure[s] . . . annual limits are adjusted annually." Plaintiff's Reply at 38.  The Court will not dictate the substance of any new catch rule on remand. *Asarco*, 616 F.2d at 1160 ("If the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration and not compensate for the agency's dereliction by undertaking its own inquiry into the merits.").

Defendants shall promulgate a new rule in compliance with the Magnuson-Stevens Act and the APA within 120 days of the Court's instant order.  The Court also orders the parties to meet and confer to propose a schedule compliant with 16 U.S.C. § 1855(d) and the APA.  The parties shall file a joint statement that does not exceed eight pages and that proposes such a schedule by September 11, 2020.  The parties shall also identify any areas of agreement or disagreement.  For areas of disagreement, the parties shall provide a brief justification for their separate proposals.

**IT IS SO ORDERED.**

34

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

Dated: September 2, 2020

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No. 19-CV-03809-LHK
ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California